UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In the Matter of

JEFFREY AUERHAHN

No. MBD No. 09-10206

## PETITION FOR ORDER TO SHOW CAUSE

By letter dated June 29, 2007, and pursuant to Rule 83.6(5) of the Local Rules of the

United States District Court for the District of Massachusetts, the Hon. Mark L. Wolf, Chief

Justice of the United States District Court for the District of Massachusetts, referred to the

Massachusetts office of bar counsel the matter of AUSA Jeffrey Auerhahn's conduct in the

prosecution of Vincent Ferrara and Pasquale Barone. Pursuant to Local Rule 83.6(5)(C) of the

United States District Court for the District of Massachusetts, bar counsel represents that there is

probable cause that the respondent has engaged in misconduct warranting discipline and petitions

this court to issue an order to Jeffrey Auerhahn to show cause within thirty days after service by

mail upon him why he should not be disciplined. The grounds for this petition are as follows.

1. The respondent, Jeffrey Auerhahn, was duly admitted to the bar of the United States

District Court for the District of Massachusetts on February 11, 1980. He was admitted to the

bar of the Commonwealth of Massachusetts on December 17, 1979.

2. In February 1985, the respondent was hired by the Department of Justice as a special

attorney assigned to the Organized Crime and Racketeering Section of the New England Strike

Force (Strike Force).

3. On January 1, 1990, the respondent became an assistant United States attorney. He

remained in the Strike Force unit until about 2003 or 2004. In about 2003 or 2004, the

respondent took another position in the United States attorney's office. The respondent has remained employed as an assistant United States attorney to date.

4. During the 1980's and the early 1990's, the Strike Force was investigating and prosecuting members and associates of the Patriarca Family of La Cosa Nostra (LCN). LCN was an organized criminal "enterprise" within the meaning of 18 U. S. C. § 1961(4). The Boston, Massachusetts, office investigated activities of LCN in New England, including the North End neighborhood of Boston.

5. In the early 1980's, the Patriarca Family was headed by a "boss." An "underboss" was second in command. In the early 1980's, Raymond L. S. Patriarca was the boss and resided in Rhode Island. Gennaro "Gerry" Angiulo was the underboss in the North End. In about 1984, Patriarca died, and Raymond J. Patriarca, his son, became the boss of the Patriarca Family. William Grasso became the underboss.

6. The Patriarca Family included various "regimes" headed by "capo regimes" subordinate to the underboss. The capo regimes acted as lieutenants or captains in the organization. In the early 1980's, Donato "Danny" Angiulo was a capo regime in the North End. "Soldiers" were "made" members of the organization assigned to regimes. To become a "made" member, a man had to be proposed for membership and inducted into the LCN in a special ceremony. "Associates" were not "made" members of the Family but were assigned to regimes and carried out assignments for members of the Family.

7. Vincent "Vinny" Ferrara was an associate of the Patriarca Family in the late 1970's and early 1980's. He was assigned to Danny Angiulo's regime. In about 1983, Ferrara became a "made" member and a "soldier" in Danny Angiulo's regime. By October 1989, Ferrara was a capo regime.

-2-

8. In the late 1970's and early 1980's, Pasquale "Patsy" Barone and Vincent James "Jimmy" Limoli were "associates" assigned to a "crew" under Ferrara's direction.

9. Walter Jordan moved to the North End in about March 1980. In late 1981 or early 1982, Jordan became friends with Barone and Limoli. Jordan also became an associate of the Patriarca Family and worked for Ferrara. In the summer of 1983, Barone married Jordan's sister.

10. On October 28, 1985, Limoli was murdered. Barone and Jordan were seen with Limoli shortly before his murder. Jordan and Barone fled from Massachusetts on or about November 5, 1985.

11. The Strike Force investigated whether or not Ferrara was involved in unsolved murders in the North End, including the murder of Jimmy Limoli. By 1987, the respondent was the Strike Force attorney in charge of the investigation.

12. Martin Coleman was a Boston police department detective assigned to the Strike Force from about 1980 until his retirement in 1997. Michael Buckley was an FBI special agent assigned to the Strike Force and the case agent for the investigation of Ferrara, Barone, and other members of LCN in the North End. Coleman and Buckley were assigned to the respondent's team in the investigation of the Limoli homicide and the subsequent prosecution of Barone and Ferrara.

13. On July 20, 1988, Walter Jordan was arrested in Greensboro, North Carolina, on a material witness warrant. On or about July 26, 1988, Jordan and the United States Department of Justice, represented by the respondent, entered into an agreement regarding Jordan's cooperation in the investigation and prosecution of Vincent Ferrara and his associates. Jordan agreed to provide complete cooperation by (a) disclosing to investigators full and truthful knowledge and information regarding Ferrara and his associates and the criminal enterprise they comprised,

-3-

(b) providing truthful and candid testimony in all respects, and (c) meeting with investigators and attorneys to prepare to testify before any grand jury and trial arising from the investigations. In return, the United States agreed (d) not to use any information provided by Jordan against him in any criminal case, other than a prosecution for perjury, obstruction of justice, or giving a false statement committed by Jordan after the date of the memorandum, (e) to make Jordan's cooperation known to other "prosecutive authorities," and (f) to sponsor Jordan's admission and the admission of his fiancée into the Federal Witness Protection Program (WPP) and provide protection until protection was available from the United States Marshal Service.

14. On July 22, 1988, Barone was arrested in Ohio by Massachusetts and federal authorities. Barone was returned to Boston on July 25, 1988.

15. On or about June 6, 1989, Barone pled guilty in Suffolk County Superior Court to manslaughter in connection with Limoli's death and was sentenced to six to ten years in state prison.

16. In March 1990, Barone and Ferrara were among eight defendants named in a sixty-five count superseding indictment filed in the United States District Court for the District of Massachusetts. The case was styled United States v. Raymond J. Patriarca et al, Cr. No. 89-289.

17. As pertinent to this petition, count one charged the defendants with conspiracy to engage in the affairs of a criminal enterprise, the Patriarca Family of La Cosa Nostra, in violation of 18 U. S. C. § 1962(d) (RICO conspiracy charge); count two charged the defendants with engaging in the conduct of a criminal enterprise in violation of 18 U. S. C. §§ 1962(c) and (2) (substantive RICO charge); count three charged that Barone and Ferrara violated 18 U.S.C. § 1952B by conspiring to "assault and beat one Vincent James Limoli, Jr., a/k/a 'Jimmy', with intent to murder him and to thereby kill and murder said Vincent James Limoli, Jr., for the purpose of gaining entrance to and maintaining and increasing positions in" a RICO enterprise;

-4-

and count four charged that Barone and Ferrara violated 18 U. S. C. §§ 1952B and 2 by "knowingly and intentionally assault[ing] and beat[ing]" Limoli "with intent to murder him and by such assault and beating did kill and murder" Limoli "for the purpose of gaining entrance to and maintaining and increasing a position in" a RICO enterprise.

18. Conspiracy to engage in RICO enterprise required the government to prove a "pattern of racketeering," defined by the statute as at least two acts of racketeering occurring within ten years of each other, with at least one of those acts occurring after October 15, 1970. To prove that the defendants engaged in the conduct of a RICO enterprise, as charged in count two, the government had to prove both a pattern of racketeering and that at least one of the racketeering acts had occurred within five years of the indictment, or after March 1985. As to Barone, the only racketeering acts alleged to have been committed within five years of the superseding indictment were conspiring with Ferrara and others to murder Limoli and murdering Limoli.

19. To prove that Ferrara and Barone were guilty of the offenses charged in counts three and four, the government was required to prove that Ferrara and Barone conspired to murder and murdered Limoli to gain, maintain, or advance their positions in the Patriarca family and not solely for motives unrelated to the Patriarca family or LCN.

20. After his arrest in July 1988, Jordan made statements to government agents and testified before the grand jury. Jordan was the primary witness establishing that Ferrara and Barone conspired to murder Limoli. As pertinent to this petition for order to show cause, the substance of Jordan's statements regarding Limoli's murder as disclosed to defense counsel are as follows:

a. Commencing in about 1981, Barone had numerous conversations with Jordan about his illegal work for Ferrara, including selling fireworks in the North End, robbing a credit union

in the North End, and committing murders. Barone told Jordan that Limoli was also involved in these activities on behalf of Ferrara.

b. By 1985, Barone had married Jordan's sister. Jordan lived with Barone and Barone's wife in the North End.

c. A week or two before Limoli's death, Barone told Jordan that Limoli had stolen a duffel bag containing drugs, money, and guns from Frank Salemme Jr., an associate of the Patriarca Family. Limoli stole the bag as revenge against Salemme for excluding him from a drug rip-off involving the sale of peat moss as marijuana. Salemme and Limoli had planned this deal together, but Salemme carried it off while Limoli was out of town. Jordan had helped Salemme with the sale of the phony marijuana.

d. Barone told Jordan that Ferrara had confronted Limoli about the theft of the duffel bag, and Limoli originally denied any knowledge of it. Limoli subsequently admitted to Ferrara and Danny Angiulo that he had taken the bag. Ferrara gave Limoli the "X," meaning that Limoli was banished from Ferrara's crew.

e. A few days before Limoli's murder, Jordan and Barone were in an automobile with Joe Bottari. Barone told Bottari that Ferrara had ordered a "hit" on Limoli and asked for Bottari's help. Bottari refused.

f. Around 6:00 p.m. on October 28, 1985, the night of the murder, Barone told Jordan that Ferrara had ordered Limoli's murder and that Jordan had to help. Barone was willing to kill Limoli on Ferrara's instructions because Barone knew that Ferrara was "moving up the ladder" in the Patriarca Family and Barone wanted to move up with him.

g. On the night of October 28, 1985, on Barone's instructions, Jordan set up a deal with Limoli for Limoli to buy 20,000 percodans for $1 each. Limoli was to meet with Jordan at D'Amore's restaurant and bring $20,000. Barone and Jordan met with Limoli. Limoli was

carrying a bag. The three men got into Barone's car, and Jordan drove to Snowhill Street. They left the car, and, as they walked up Hull Street, Barone dropped back and shot Limoli in the head. On Barone's order, Jordan grabbed the bag Limoli had brought, and Jordan and Barone ran down Hull Street to a playground.

h. At the playground, they discovered that the bag taken from Limoli contained only napkins. Barone ran back up the street, with Jordan following, and shot Limoli in the head until his gun was empty. Jordan, on Barone's orders, went through Limoli's pockets and took a roll of money and a gun. They both then ran back home.

i. After they returned home, there was a telephone call announcing that Limoli had been shot. The caller came to the house and took Barone to the hospital. Jordan followed in a cab. Limoli died at the hospital.

j. On Barone's instructions, Jordan and another man went to Limoli's sister's apartment, where Limoli lived, and retrieved a large wooden box. Jordan and the other man took the box to Barone's apartment. Barone opened the box and found guns and other items.

k. Barone's wife announced a telephone call from Ferrara. Barone spoke with Ferrara. Barone then told Jordan that Ferrara wanted the box. Barone took from the box two guns for himself and another gun for Jordan. Barone put the rest of the contents of the box in a duffel bag and took the bag across the street to Ferrara's girlfriend's place.

l. A few days after the murder, around the time of Limoli's wake, Ferrara asked Jordan and Barone join him in Ferrara's Lincoln. Another man whom Jordan could not identify was in the car. Ferrara asked where Jordan and Barone were on the night of Limoli's murder. Jordan believed that Ferrara was asking these questions in front of the other man to imply falsely that Ferrara had no involvement in Limoli's death.

-7-

m. After Limoli's wake and funeral, Jordan's brother Chris called Barone to say that

Ferrara wanted to see Barone right away at Francesco's restaurant. About one-half hour later,

Barone returned to the apartment "hysterical" and said, "Walter, we have to get out of here"

because Ferrara was going to kill them. Barone did not explain why Ferrara wanted to kill them.

n. The next day, November 5, 1985, Barone and Jordan fled from Boston, each going his

separate way. In the fall of 1986, Jordan was living in Myrtle Beach, South Carolina, and

managing a hotel. Barone came to stay with him for about six weeks. Barone then left for Ohio.

21. Jordan's testimony that Barone told him that Ferrara ordered Limoli's murder was

crucial to proving counts three and four of the superseding indictment against both Ferrara and

Barone and count two of the superseding indictment against Barone.

22 The respondent was lead counsel in prosecuting the superseding indictment. The

respondent was assisted in the prosecution of the case by AUSA's Gregg Sullivan and James

Herbert.

23. Effective September 1, 1990, Local Rule 116.1 of the United States District Court for

the District of Massachusetts provided in pertinent part as follows.

> In all criminal cases, the following material and information in the
> possession, custody or control of the parties, the existence of which is known, or
> by the exercise of due diligence may become known, to the attorneys for the
> parties, shall be disclosed to the opposing party.
>
> Such disclosure will be routine and automatic, i.e., without any court order
> in the particular case. It shall occur as soon as counsels' trial engagements permit
> and in all events within fourteen (14) days after arraignment.
>
> (a) The government shall disclose, and allow the defendant to inspect,
> copy and photograph, all written material as follows:…(5) All exculpatory
> evidence within the meaning of *Giles v. Maryland*, 386 U.S. 66…(1967), *Brady v.
> Maryland*, 373 U.S. 83…(1963) and *Giglio v. United States*, 405 U.S.
> 150…(1972).
>
> (c) Any duty of disclosure and discovery set forth herein is a continuing
> one.

24. Prior to September 1, 1990, Local Rule 42 imposed the same requirements for automatic discovery in criminal cases, except that the rule did not cite *Giglio v. United States*.

25. By memorandum and order dated May 15, 1990, issued by the federal district court, the government was required to provide to defense counsel in United States v. Patriarca et al. exculpatory evidence as to government trial witnesses unless the information consisted of material specified in 18 U. S. C. § 3500, known as the "Jencks Act." In that event, the information need not be disclosed until and unless the witness was called at trial.

26. Attorney Oscar Goodman represented Ferrara in the criminal case. Attorney Bernard Grossberg represented Barone. At trial, Attorney Richard Egbert also represented Barone.

27. After the indictment, Walter Jordan's statements and testimony as summarized in paragraph 20 were furnished to Ferrara's and Barone's defense counsel.

28. After the date of indictment, the respondent represented to Goodman and Grossberg that the government was complying with its statutory and constitutional obligations to disclose exculpatory information to the defense. The respondent also represented to counsel for Ferrara and Barone that the government would provide "impeachment information as defined in United States v. Agurs, 427 U.S. 97 (1976) and Giglio v. United States, 405 U.S. 150, 154 (1972)."

29. On and after the date of the indictment, the respondent acknowledged to defense counsel the government's continuing duty to turn over exculpatory evidence within the meaning of *Brady v. Maryland,* 373 U.S. 83 (1963), and accompanied that acknowledgment with documents and information purporting to be in compliance with that obligation.

30. The respondent advised defense counsel for Ferrara and Barone that the only exculpatory evidence not provided to the defense by the government consisted of promises, rewards or inducements made to witnesses who would testify at trial but whose identity had not been disclosed to the defense. Jordan's identity had been disclosed to the defense.

31. The jury trial on the superseding indictment was scheduled to begin in the fall of 1991.

32. On July 22, 23, and 24, 1991, the respondent, Sullivan, Coleman, and Buckley met with Jordan in Salt Lake City, Utah, to prepare Jordan to testify in the upcoming trial. Over these three days, the respondent and Sullivan and the other government agents reviewed with Jordan his knowledge of Barone's involvement in the Patriarca Family, Limoli's murder and other crimes committed by Barone, the events after Limoli's murder, and other subjects pertinent to the upcoming trial and Jordan's testimony. The respondent took notes of Jordan's statements during the meetings with him (Utah notes).

33. During the session, Jordan told Auerhahn and the other government agents that on the evening after Limoli's wake, Jordan's brother Chris called Barone to say that Ferrara wanted to see him at Francesco's. When Barone returned from Francesco's, he told Jordan that they had to get out of town because Ferrara was going to kill them, but Barone would not say why. Jordan also told the government that Barone came to visit him in the summer of 1986 when Jordan was living in Myrtle Beach, South Carolina. Jordan asked Barone again why Ferrara wanted to kill them, and Barone answered that he did not know. Jordan's parents told Jordan that Barone was supposed to kill Jordan too because he was a witness. These statements are included in the respondent's Utah notes.

34. On July 24, 1991, Jordan came to Coleman's hotel room late at night. Jordan told Coleman that: (a) he had not yet told the entire truth to the government; (b) Barone had not gotten permission from Ferrara to kill Limoli; (c) Barone told Jordan upon his return from Francesco's that they had to get out of town because Ferrara was going to kill them. When Jordan asked why, Barone said that he had not gotten permission to kill Limoli.

-10-

35. Coleman did not create a written report concerning Jordan's statements to him on or about July 24, 1991.

36. On July 25, 1991, the respondent, Sullivan, Coleman, and Buckley returned to Boston from Utah.

37. On or about July 26, 1991, Coleman reported to Auerhahn that Jordan had made disclosures to him in Utah late in the evening of July 24th. According to Coleman, Jordan said that Barone told him upon returning from Francesco's that they had to leave Boston because Barone had not gotten permission from Ferrara to murder Limoli. The respondent observed that Coleman was upset and agitated when making this report.

38. The respondent did not instruct Coleman to document Jordan's statements to him in writing. The respondent did not take any other action to document or memorialize Jordan's statements as reported by Coleman. The respondent intentionally did not have Coleman document the statements made to him by Jordan to avoid being required to turn over Coleman's report to defense counsel.

39. On or about July 26, 1991, the respondent made arrangements through the United States Marshal to talk to Jordan by telephone. On or about July 29, 1991, Jordan telephoned the respondent in accordance with the arrangements the respondent had made. Coleman was present for Jordan's call.

40. In the telephone call of July 29, 1991, Jordan told the respondent that Barone had told him upon returning from Francesco's that Ferrara was going to kill them because Barone had not received Ferrara's permission to murder Limoli. The respondent told Jordan that the government would meet with him again to review his testimony.

41. The respondent understood that Jordan's statement that Barone had told him after returning from Francesco's that Ferrara was going to kill them because Barone had not gotten

permission from Ferrara to kill Limoli was exculpatory evidence. The respondent knew that this statement had not been furnished to any of the defense counsel.

42. The respondent did not instruct Coleman to document Jordan's statements in writing. The respondent did not otherwise document or memorialize Jordan's statements. The respondent intentionally did not have Coleman document the statements Jordan made in the telephone conversation to avoid being required to turn over the report to defense counsel.

43. Sometime after the telephone conversation with Jordan on July 29, 1991, Coleman wrote a memorandum to the "file" to document Jordan's statements to him. Coleman's handwritten memorandum is attached as Exhibit 1 and is incorporated in this petition. The memorandum included, among other things, Jordan's statement that, when Barone returned from Francesco's, he told Jordan that they had to get out of town and that Ferrara was going to kill them because Barone had not gotten "permission to kill Jimmy."

44. Coleman had the handwritten memorandum typed. The typed memorandum was the same as the handwritten memorandum except for possible corrections of spelling errors. Coleman placed his handwritten memorandum in a file folder that he kept in his file cabinet at the Strike Force.

45. Sometime on or after July 29, 1991, and before August 26, 1991, Coleman delivered the typed memorandum to the respondent. The whereabouts of the typed memorandum are currently unknown.

46. The respondent understood that he was required to turn over to defense counsel for Barone and Ferrara the typed memorandum or, at a minimum, Jordan's statement to Coleman on July 24, 1991, and to Coleman and the respondent on July 29, 1991, that Barone told Jordan after returning from Francesco's that Ferrara was going to kill them because Barone had not gotten permission to murder Limoli. The respondent knew that this information was exculpatory.

47. The respondent did not disclose to defense counsel for Barone, Ferrara, or the other defendants the memorandum furnished to him by Coleman. The respondent did not otherwise disclose to defense counsel Coleman's report that Jordan told him that Barone had told Jordan upon his return from Francesco's that Ferrara was going to kill them because Barone had not gotten permission to kill Limoli. The respondent knew that no other member of the government had disclosed or would disclose these statements to defense counsel.

48. From July 26, 1991, through August 12, 1991, the federal court held evidentiary hearings on Barone's motion to suppress statements he made after his arrest. The respondent, Sullivan, and Herbert represented the government at these hearings.

49. On August 21, 1991, Judge Wolf allowed Barone's motion to suppress. The government appealed from the order allowing the motion to suppress. Barone's case was severed from the other co-defendants' cases.

50. Except for Barone, the trial on Ferrara and the other co-defendants was scheduled for the fall of 1991.

51. On August 27 and 28, 1991, the respondent, Coleman, and Buckley met with Jordan in Minneapolis, Minnesota, to discuss Limoli's homicide and Jordan's conversations with Barone before and after Limoli's murder. Sullivan did not travel to Minnesota.

52. After the Utah meeting, the respondent prepared a trial outline containing Jordan's expected testimony. The respondent brought the trial outline with him to Minnesota. The respondent took notes in Minnesota during the meeting with Jordan on his trial outline (Minnesota notes).

53. The respondent's Minnesota notes record Jordan's statements that Barone said to Jordan on one occasion in South Carolina that Ferrara had not approved of or ordered the murder.

-13-

The Minnesota notes reflect Jordan's statement that Jordan pressed Barone on the statement that Ferrara had not approved of or ordered Limoli's murder.

54. The respondent's Minnesota notes reflect Jordan's statements that Barone did not tell Jordan why Ferrara wanted to kill them but that Jordan's parents told him it was because Barone was supposed to have killed Jordan as well.

55. The respondent understood that Jordan's statement that Barone told Jordan that Ferrara had not ordered Limoli's murder was exculpatory and that he was required to turn the information over to defense counsel for Ferrara and Barone.

56. The respondent did not instruct either Buckley or Coleman to memorialize Jordan's statement at the Minnesota meeting that Barone told Jordan on one occasion that Ferrara had not ordered or approved Limoli's murder. The respondent knew that neither Coleman nor Buckley would memorialize any of Jordan's statements in Minnesota. Neither Coleman nor Buckley did so.

57. The respondent intentionally did not have Jordan's statements in Minnesota documented in an FD-302 or in other written form by Coleman or Buckley to avoid being required to turn over the report to defense counsel.

58. The respondent did not promptly inform Barone's defense counsel of Barone's statement to Jordan that he had not gotten permission from Ferrara to kill Limoli. The respondent never informed Ferrara's defense counsel of Jordan's statement that, on one occasion, Barone told him that Ferrara had not ordered Limoli's murder.

59. On or about September 4, 1991, the respondent brought to Coleman a typed memorandum purporting to document Walter Jordan's statements to Coleman on July 24, 1991. A true copy of the typed memorandum is attached to and incorporated in this petition as Exh. 2.

60. Exh. 2 contains the following pertinent statements: (a) that Jordan told Coleman at 11:30 p.m. on July 24, 1991, that he had said some things during the debriefing that were not true; (b) that, when Barone returned from "Franchesca's," Barone said that he and Jordan had to leave right away "because Ferrara would kill them because Barone had "'fucked up[;]'" and (c) that Jordan's statements made at a meeting with the government on August 27 and 28, 1991, would be "memorialized in a 302 report by SA Buckley."

61. Coleman placed Exh. 2 in the folder that contained his handwritten memorandum. Coleman did not sign the memorandum or return it to the respondent.

62. The respondent never produced Exhibit 2 to defense counsel for Barone and Ferrara or any other defendant in the case. The respondent never produced the substance of the information contained in Exhibit 2 to defense counsel.

63. On October16, 1991, the respondent filed a trial brief in the matter of United States v. Patriarca et al. The memorandum set forth a summary of the evidence that the government planned to rely upon in its case against Ferrara and the other defendants. The memorandum described the testimony expected from Walter Jordan. The respondent represented in the trial brief that Jordan would testify to Barone's statement to him that Ferrara had ordered Limoli's murder.

64. Jury selection in the trial against Ferrara and the co-defendants, except Barone, began on January 6, 1992.

65. After jury selection, Ferrara and his co-defendants and the government entered into interlocking plea agreements.

66. On January 22, 1992, Ferrara entered a plea of guilty to all of the charges against him. Part of the consideration for the plea was the government's agreement to recommend that Ferrara be sentenced to twenty-two years in prison and the government's promise that he would

-15-

not be prosecuted for the murder of William Grasso and the attempted murder of Francis

Salemme Sr. and that the Commonwealth would not prosecute Ferrara for the murder of Vincent

James Limoli. The government's trial brief provided the factual basis for the plea.

67. On April 29, 1992, Ferrara was sentenced to 264 months on the charges of

conspiracy to commit Limoli's murder and the murder of Limoli, with sixty months of

supervised release thereafter. On the rest of the charges, Ferrara was sentenced to time served

and two years of supervised release. Ferrara was ordered to forfeit $1,116,200.

68. On May 8, 1992, the respondent wrote a letter to Attorney Martin Weinberg, counsel

for Raymond J. Patriarca, enclosing discovery in connection with Patriarca's sentencing. The

respondent wrote,

> On several occasions prior to the murder of Vincent James Limoli, Jr., Pa[s]quale
> G. Barone explained, in some detail, to Walter A. Jordan, or to another in Jordan's
> presence, the motive for the Limoli homicide. Shortly after the murder, Jordan
> fled Boston at the direction of Barone. (Barone fled as well.) Some time later,
> Jordan learned the reason why he and Barone were forced to flee. Jordan learned
> that Barone was supposed to use Jordan to set up Limoli and then kill Limoli **and**
> Jordan on the night of October 28, 1985. For failing to follow the order from
> Vincent M. Ferrara, and for sparing the life of his brother-in-law, Barone had
> incurred the wrath of Ferrara and proven to be unreliable. Therefore, both Barone
> and Jordan were in jeopardy if they remained in Boston. On one occasion,
> however, Barone provided a different reason which compelled Barone and
> Jordan's flight from Boston. Prior to learning that he too was to be killed, Jordan
> was told by Barone that they had to leave Boston because Barone did not get
> permission to kill Limoli. When Jordan pressed Barone on this, Barone
> immediately retracted the statement, and reiterated that the murder was at
> Ferrara's direction. Thereafter, Barone never again stated that the murder was
> anything but a sanctioned hit.

69. The respondent's letter of May 8, 1992, to Weinberg was the first disclosure made by

the respondent or any other member of the government to any of the defense counsel in United

States v. Patriarca et al. that Barone had ever told Jordan on any occasion that Ferrara had not

given permission to Barone to kill Limoli. The respondent did not disclose that Barone's

disclosure to Jordan that he did not have permission to kill Limoli was made upon Barone's return from Francesco's to explain why they had to leave Boston.

70. The respondent had no written documentation on May 8, 1992, that Jordan told the government that Barone "immediately retracted" his statement to Jordan that Ferrara had not ordered or sanctioned Limoli's murder.

71. On July 6, 1992, the United States Court of Appeals for the First Circuit affirmed the federal district court's order suppressing Barone's post-arrest statements in *United States v. Barone*, 968 F.2d 1378 (1st Cir. 1992). The court of appeals remanded the matter to the district court to decide whether Barone's statements volunteered at the time of his arrest should be suppressed.

72. By letter dated May 28, 1993, signed by AUSA Sullivan, the government disclosed to Barone's counsel Grossberg the information quoted in paragraph 68 above. The respondent knew of and approved or ratified the contents of this letter. The respondent had not informed Sullivan of Jordan's statements to Coleman on July 24, 1991, or in the telephone conversation on July 29, 1991. The respondent had not shown Sullivan any memorandum produced for or by Coleman documenting Jordan's statements in those two conversations. Sullivan also had not been present for the meetings in Minnesota with Jordan. The respondent did not show Sullivan his Minnesota notes.

73. In 1993, the respondent met with Jordan in Boston prior to Barone's trial. The respondent added notes from his meetings with Jordan to the trial outline, and he added additional notes to the outline during the Barone trial.

74. Jury selection started in the trial of United States v. Barone on August 9, 1993. The trial continued until October 29, 1993. Barone's two key defenses were that (a) Jordan or someone else, not Barone, killed Limoli, and, (b) regardless of who killed Limoli, Ferrara had not

ordered the killing and the killing resulted from a failed drug transaction, drug rip-off, or other dispute unrelated to achieving, improving or maintaining Barone's position in LCN.

75. Coleman testified for the government at the Barone trial. The respondent questioned Coleman for the government. Coleman's testimony was confined to identifying surveillance photographs and persons shown in those photographs and documenting the receipt of records pursuant to a subpoena issued to First Security, the employer of the security guard shot by Barone during a hold-up.

76. During the Barone trial, the respondent did not question Coleman about statements made to him by Jordan. The respondent did not produce to defense counsel during the trial Exhs. 1 and 2 or the substance of those memoranda.

77. Jordan testified for the government at the Barone trial on September 8, 9, 10, 20, 21, and 23, 1993. The respondent handled Jordan's examination for the government.

78. On September 8, 1993, Jordan testified under examination by the respondent as follows:

> Q. Now, did he at any point tell you that Mr. Ferrara did not approve of the murder?
> A. We were—He was kidding around. We were both kidding around, and I said, yeah, he said, Vinny ordered the hit. And he said, nah, Vinny didn't order the hit. And then he finally said, yeah, Vinny did order the hit.
> Q. Now, did he ever explain to you why Mr. Ferrara wanted to kill him and you?
>
> ***
>
> A. Yes, Patsy did.
>
> ***
>
> Q. Sir, do you recall when that was?
> A. That was in South Carolina.
> Q. And, what did he tell you about why Ferrara wanted to kill him and you?
> A. Because he didn't kill me.
> Q. Didn't kill you, when?
> A. The night of the murder.

Q. Why was Mr. Barone supposed to kill you?

A. I'm a witness.

79. The respondent had no documentation on September 8, 1993, or at any point in the
Barone trial in the form of notes or otherwise of Jordan's telling the government that Barone and
Jordan were "kidding around" when Barone said that Ferrara had not "ordered the hit" on Limoli,
and he had no documentation that Barone retracted the statement. The respondent's Minnesota
notes documented that it was Jordan's parents and not Barone who told Jordan that Ferrara
wanted Jordan killed too.

80. During the Barone trial, defense counsel objected on numerous occasions that the
government had failed to turn over or failed timely to turn over Jencks information and
exculpatory evidence.

81. On September 28, 1993, during a lobby conference, the prosecution disclosed to the
court a FD-302 (302) created by Buckley that the court deemed exculpatory. The court instructed
Auerhahn and Sullivan to turn this statement over to defense counsel and admonished them that
this statement should have been turned over when Jordan testified.

82. In open court, Egbert cross-examined Buckley concerning the statements contained
in his 302 and offered the report as evidence. The court instructed the jury that

...in a...criminal case, the United States has an obligation to turn over to the
defendant any information that might be used to impeach or challenge the
credibility of a witness. Information that the United States has that is inconsistent
with what it expects a witness will testify is exculpatory.

83. The superseding indictment charged as a racketeering act that Barone had engaged in
conspiracy with Ferrara, Limoli, and others to murder Anthony "Dapper" Corlito on July 21,
1979. The superseding indictment charged Ferrara, but not Barone, with the racketeering act of
conspiracy to murder Giacomo "Jackie" DiFronzo on December 11, 1977.

-19-

84. At Barone's trial, Jordan testified that Barone told Jordan that he had assisted Ferrara in the Corlito and DiFronzo murders. None of discovery provided to Barone's defense counsel disclosed statements by Jordan implicating Barone in these homicides.

85. On September 28, 1993, Buckley was questioned on cross-examination about the lack of documentation in Buckley's 302's of portions of Jordan's trial testimony. This included but was not limited to Jordan's testimony that Barone had told Jordan that he had assisted in the DiFronzo and Corlito murders.

86. Defense counsel's questions to Buckley regarding Jordan's testimony implied that Jordan's testimony about Barone's admissions to involvement in the Corlito and DiFronzo murders was a recent invention. Buckley testified that Jordan had related Barone's admissions to these incidents to the government prior to trial and that the respondent had notes of these statements from sessions with Jordan in 1988 and 1991.

87. In a lobby conference on September 28, 1993, Egbert demanded that the respondent and Sullivan produce their notes. The respondent represented to the court that he had taken notes in 1988 during meetings with Jordan in Maine prior to Jordan's grand jury testimony but that he could not locate those notes. The respondent also informed the court that Buckley was referring to "30 pages of notes from July of 1991." He also told the court that he had "extensive notes from the summer of '91. And those notes do exist, but they're not discoverable."

88. In response to the respondent's assertion that his notes were not discoverable, the court stated:

> I don't think your notes come in unless there's something exculpatory in them, and there could be. I haven't heard anything yet that makes them Jencks material with regard to Buckley. But, you know, for example, I mean, if Jordan had said to you in this walk [in] the woods, Gee, you know, I've made up half of what I told Mike Buckley because I don't want to get prosecuted for the Limoli murder, that would be exculpatory even though it was in your notes and not Buckley's notes.

So, the fact that something is in an attorney's notes, as I perceive it at the moment, doesn't immunize it from being potential Brady material, if it is not otherwise available to the defendant, if it hasn't already been made known to the defendant. But, basically, the first inquiry is, you know, is there anything exculpatory, including anything inconsistent, with his present testimony in those notes.

89. Egbert pressed the court to require the government to disclose the government's notes, referring to Buckley's testimony that notes were taken in Maine in 1988 and in July of '91 to prepare for trial. Egbert urged the court to order the respondent to turn over the thirty pages of notes the respondent said that he had. The respondent replied that there was a trial preparation meeting in "the latter part of July 1991" for a "trial date of September 1991" and that notes such as those are not discoverable. The respondent did not inform the court or opposing counsel that there was another trial preparation meeting in August 1991 at which he took notes.

90. The court agreed that work product was not discoverable but that "exculpatory evidence" in the notes would be discoverable. At the end of the lobby conference, the court ordered the respondent to turn over that afternoon under seal "the portion of the notes that refer to Corlito and DiFronzo because you want to get that in." The court would then research the discoverability of attorney's notes "if they're exculpatory."

91. On September 28, 1993, the respondent turned over to the court his Utah notes. These notes memorialized Jordan's statements in Utah concerning Barone's involvement in the Corlito and DiFronzo murders.

92. The respondent's trial outline with the Minnesota notes included Jordan's statements to him and other government agents about Barone's involvement in the DiFronzo and Corlito murders. The respondent intentionally withheld these notes from the court. The respondent did not notify the court or opposing counsel that he had withheld his trial outline from meetings with Jordan after July 1991 in Minnesota and Boston containing notes reflecting Barone's involvement in the DiFronzo and Corlito murders.

93. On September 29, 1993, the court held a lobby conference. The respondent attended. The court noted that it had received from the government "notes furnished under seal from 1991 regarding DiFronzo and Corlito...." The respondent did not inform the court that he had withheld his trial outline containing notes from a meeting with Jordan in August 1991 and from other meetings thereafter that also addressed the DiFronzo and Corlito murders.

94. On September 29, 1993, the court ruled that the government would be permitted to introduce evidence that Jordan had previously told the government about Barone's admission to involvement in the DiFronzo and Corlito murders.

95. During the lobby conference on September 29, 1993, the court advised the parties that exculpatory factual information included in attorneys' notes, "including inconsistent statements of witnesses' testimony," must be turned over to the defense. The court instructed the respondent and Sullivan to produce under seal their notes of discussions with Jordan. The government was ordered to propose redactions for mental impressions and irrelevant information and identify for the court information in the notes that is "exculpatory information within the meaning of Brady and its progeny, including any statements Mr. Jordan may previously have made which are inconsistent with his testimony." The government was required to file with the court copies of their complete notes and the government's proposed redacted version of those notes.

96. During the lobby conference, Sullivan represented to the court in Auerhahn's presence that "every bit" of exculpatory evidence had been turned over to the defense. The respondent heard Sullivan make this representation, and he knew that this statement to the court was not true. The respondent knew that the government had not turned over to defense counsel the memoranda reflecting Coleman's report to him of Jordan's statements to Coleman and the respondent in July 1991. The respondent knew that the government had not turned over to

defense counsel the substance of these memoranda that Barone told Jordan upon returning from Francesco's that they had to leave Boston because Barone had "fucked up" or had not gotten permission to kill Limoli.

97. The respondent also knew that he had not turned over to the court his trial outline containing the notes inconsistent with Jordan's testimony at trial. The respondent knew that his trial outline contained notes inconsistent with Jordan's testimony that (a) Barone "kidded around" in Myrtle Beach when he told Jordan that he had not gotten permission to kill Barone and immediately retracted that statement and (b) that Barone told Jordan that Ferrara wanted to kill them because Barone had not killed Jordan.

98. The respondent did not inform the court that he had withheld exculpatory information as defined by the court in its order. The respondent did not inform the court that he had withheld notes impeaching or contradicting Jordan's testimony at trial.

99. On September 30, 1993, the court reminded the respondent and Sullivan that the court had requested the previous day "the notes of the conversations with Walter Jordan identifying anything that might be exculpatory and proposing redaction." Sullivan and the respondent produced their notes for the Utah meeting.

100. The respondent intentionally withheld his trial outline containing notes from the Minnesota and other meetings with Jordan. The respondent did not inform the court or defense counsel that he had withheld from production certain notes of conversations with Jordan. The respondent did not disclose to the court or to defense counsel that Coleman had reported to him an inconsistent or exculpatory statement from Jordan that had not been produced to the defendants.

101. On October 1, 1993, the court advised the parties in a lobby conference that the notes provided by Sullivan and Auerhahn contained nothing exculpatory. The court did not order that the government's notes be turned over to the defense.

102. On October 20, 1993, the court charged the jury, and the jury retired to deliberate. On October 25, 1993, the jury reported that it was deadlocked, and the court gave an modified "Allen" instruction, pursuant to *Allen v. United States*, 164 U.S. 492 (1896), asking the jury to continue to deliberate. On October 26, 1993, the jury reported again that it was deadlocked. On October 27, 1993, the court instructed the jury to resume again its deliberations. On October 28, 1993, a juror was excused from deliberations. On October 29, 1993, the jurors reported verdicts of guilty on counts one through three and a deadlock on count four.

103. On April 25, 1994, the court held a sentencing hearing. The respondent argued that Barone should be sentenced to life in prison for the conviction on count three. The recommendation for life resulted from a misreading of 18 U. S. C. § 1952(b)(A)(1) and (5), which actually prescribed a maximum sentence of ten years for conspiracy to commit murder in aid of racketeering. This error was undetected by defense counsel, the court, and probation.

104. On April 24, 1994, the court sentenced Barone to life in prison on count three for conspiracy to commit murder in aid of racketeering. On counts one and two, Barone was sentenced to a term of 20 years in prison to be served concurrently with the life sentence. Because Barone was not sentenced under the sentencing guidelines, he was eligible for parole in ten years.

105. Barone appealed from his conviction to the United States Court of Appeals for the First Circuit. The conviction was affirmed on June 6, 1997, in *United States v. Barone*, 114 F.3d 1284 (1st Cir. 1997).

106. In May 2002, Jordan contacted the Strike Force. Jordan alleged government corruption in the Barone and Ferrara cases. During the summer of 2002, Jordan was interviewed by FBI agents. Jordan told the agents that he had told the respondent, Sullivan, Buckley, and Coleman during a debriefing session in Utah that Ferrara had not ordered Limoli's murder. Jordan stated that he had been ordered from the room by Buckley. Coleman joined him shortly thereafter and told Jordan to "'do the right thing'" and "'stick with his original story.'" Jordan claimed that he recanted his statement because he was intimidated. Jordan asserted that the prosecutors knew that he perjured himself at trial when he testified that Barone told him that Ferrara had ordered the murder. In fact, per Jordan, he only "assumed" that Ferrara had ordered Limoli's death.

107. Prior to 2002, Barone and Ferrara had filed petitions pursuant to 28 U. S. C. § 2255 (§ 2255 petitions) to vacate, set aside, or correct their sentences. When their counsel learned of Jordan's disclosures, the § 2255 petitions were amended.

108. In the § 2255 proceedings, Attorneys Weinberg and David Chesnoff represented Ferrara, Egbert and Grossberg represented Barone, and AUSA's James F. Lang and Robert E. Richardson represented the government.

109. By order dated August 14, 2003, the court required the government to produce to Barone's and Ferrara's counsel, among other things, "any reports or notes made by any participant in the Salt Lake City meeting regarding any discussion with Jordan at any time...." Pursuant to this order, the respondent was requested to produce all notes of his discussions with Jordan. The respondent intentionally failed to provide to the government's counsel his trial outline containing his Minnesota notes and notes of statements from Jordan after the Minnesota meeting. The respondent did not inform the government lawyers or agents or the court that he was withholding or had withheld these notes.

110. The federal district court held hearings on § 2255 petitions on September 3, 4, 5, and 24, 2003.

111. Jordan testified in the § 2255 hearing that, following his arrest, he lied to the government and to the grand jury that Barone had told him that Ferrara ordered Barone to kill Limoli. Jordan further stated that he had perjured himself at Barone's trial by testifying that Barone told him this.

112. In the § 2255 hearing, Jordan testified that he was certain that he had met with the respondent and the other government agents first in Minnesota and then in Utah. In fact, the government met with Jordan first in Utah and then in Minnesota.

113. Jordan testified in the § 2255 hearing that he went to Coleman's room after a session Jordan placed in Minnesota and told Coleman that he was "lying" about Barone's telling him that Ferrara had ordered the "hit" on Limoli. Jordan told Coleman that he "'assumed'" Ferrara had ordered Limoli's murder but that Barone never told him that Ferrara had ordered the murder.

114. In the § 2255 hearing, Jordan testified to a second debriefing session prior to trial, which he incorrectly placed in Utah. He testified that he told the government prosecution team, including the respondent, "[Y]ou know, Patsy never told me Vinn[y] ordered the hit." According to Jordan, Buckley became "[v]ery angry" and either Buckley, the respondent, or Sullivan asked him to leave the room. Coleman came out after him and told Jordan to "just stick to your original story. You don't know that Vinn[y] didn't order it for a fact, and do the right thing." Jordan decided to revert to his original story that Barone had told him that Ferrara had ordered the hit on Limoli.

115. Coleman testified in the § 2255 hearing that Sullivan had ordered Jordan from the room during the first debriefing sessions and that Coleman had been instructed to "straighten him

out." Coleman testified that he did not know what Jordan had said to prompt his exit from the room. Outside the room, Coleman asked Jordan if he had told the truth to the authorities when he was arrested in Greensboro, North Carolina. Jordan said, yes. Coleman told Jordan to go back to his statement to the authorities when he was arrested in Greensboro and not leave the "four corners of that statement and start putting things in here that you think. Stick to the facts and tell the truth."

116. Prior to the § 2255 hearing, Coleman told the government that he had created a memorandum after a debriefing of Jordan and had it typed. Coleman testified at the § 2255 hearing on September 3, 1993, that Jordan had come to his room in Utah and made statements that he memorialized in a memorandum. Coleman testified that he had the memorandum typed and delivered the typed memorandum to the respondent.

117. Following Coleman's testimony, the government initiated a search for the memorandum. On September 4, 2003, the government located Exhs. 1 and 2 in a folder in the cabinet Coleman used when he was at the Strike Force. The government delivered the documents to the court. Copies of the documents were provided to Barone's and Ferrara's counsel.

118. On September 5, 2003, the respondent testified in the § 2255 hearing. The respondent denied having ever received a written report from Coleman and could not recall having ever seen Exhibits 1 or 2.

119. The respondent testified in cross-examination on September 5, 2003, that he did not find "independent separate notes from Minneapolis" although he could not say "that I didn't have [the Utah] notes with me and made some changes on them...." The respondent acknowledged that failing to take notes at a debriefing with a witness would represent a departure from his usual practice.

120. Between September 5, 2003, and September 24, 2003, the respondent realized that Barone's life sentence was a mistake and filed a motion to correct the sentence. On September 24, 2003, the court acknowledged the government's disclosure that the maximum sentence on court three was ten years and not life. The court informed the parties of its intention to reduce the life sentence to ten years in prison.

121. Between September 5, 2003, and September 24, 2003, the respondent produced for AUSA Lang the trial outline containing the notes made in meetings he had with Jordan in Minnesota and in Boston prior to Jordan's testimony at Barone's trial. The respondent had never before produced these notes to the court, Barone's or Ferrara's counsel, or the government's counsel.

122. On September 24, 2993, Lang provided to the court the trial outline containing the notes made in Minnesota and subsequent meetings with Jordan. The trial outline was marked as an exhibit and provided to the petitioners' counsel.

123. On October 3, 2003, the court informed the parties that it would grant Barone's § 2255 petition due to the government's failure to provide to Barone's defense counsel Jordan's statements to Coleman and later to Coleman and Auerhahn that Barone told him they had to flee from Boston because Barone had not gotten permission from Ferrara to kill Limoli.

124. Following the court's decision, the government and Barone negotiated a plea agreement in which Barone agreed to plead to count two of the superseding indictment charging the substantive RICO offense in violation of 18 U. S. C. § 1962(c) in return for the government's agreement not to appeal the allowance of the § 2255 petition, a recommendation of a time-served sentence, and dismissal of the remaining counts.

125. On October 24, 2003, the court accepted Barone's plea to count two and sentenced him to time served. The remaining counts of the superseding indictment were dismissed.

126. On April 12, 2005, the federal district court allowed Ferrara's petition to vacate and set aside his sentence due to the government's failure to disclose to Ferrara's counsel Jordan's statements to Coleman and later to Coleman and Auerhahn that Barone told him they had to flee from Boston because Barone had not gotten permission from Ferrara to kill Limoli. The court's decision is reported as *Ferrara v. United States*, 384 F.Supp.2d 384 (D. Mass. 2005).

127. On May 13, 2005, the federal district court vacated Ferrara's sentence and sentenced him to time served with three years of supervised release subject to conditions.

128. On August 10, 2006, the United States Court of Appeals for the First Circuit affirmed the district court's decision vacating Ferrara's sentence in *Ferrara v. United States*, 456 F.3d 278 (1st Cir. 2006).

129. The respondent's conduct in failing to instruct Coleman promptly to memorialize Jordan's statements to him on July 24, 1991, in Utah violated S.J.C. Rule 3:07, Canon Six, Disciplinary Rule 6-101(A)(3), and S.J.C. Rule 3:08, PF 7(b), set forth below.

130. The respondent's conduct in failing to preserve and to make timely disclosure to Barone's and Ferrara's defense counsel of Coleman's typed version of Exhibit 1 or the substance of those disclosures, and asserting to defense counsel and permitting the government to assert to the court that the government was providing all exculpatory evidence violated S.J.C. Rule 3:07, Canon One, Disciplinary Rules 1-102(A)(4), (5) and (6); Canon Six, Disciplinary Rule 6-101(A)(3); Canon Seven, Disciplinary Rules 7-102(3), 7-103(B), and 7-106; and S.J.C. Rule 3:08, PF 7(a), set forth below.

131. The respondent's conduct in failing to make timely disclosure of Exhibit 2 or the substance of Exhibit 2 to Barone's and Ferrara's defense counsel, and asserting to defense counsel and permitting the government to assert to the court that the government was providing all exculpatory evidence violated S.J.C. Rule 3:07, Canon One, Disciplinary Rules 1-102(A)(4),

(5), and (6); Canon Six, Disciplinary Rule 6-101(A)(3); Canon Seven, Disciplinary Rules 7-102(3), 7-103(B), and 7-106; and S.J.C. Rule 3:08, PF 7(a), set forth below.

132. The respondent's conduct in failing, other than in his notes, to memorialize or cause an agent to memorialize Jordan's statements in Minnesota and/or thereafter that Barone had told him that Ferrara had not given him permission to kill Limoli and in not making timely disclosure of those statements to Barone's and Ferrara's trial counsel violated S.J.C. Rule 3:07, Disciplinary Rules 1-102(A)(4), (5), and (6); Canon Six, Disciplinary Rule 6-101(A)(3); Canon Seven, Disciplinary Rules 7-102(A)(3), 7-103(B), and 7-106; and S.J.C. Rule 3:08, PF 7(a), set forth below.

133. After the trial court ordered the respondent during the Barone trial to turn over all notes of his conversations with Jordan regarding DiFronzo and Corlito and, subsequently, all notes of government meetings with Jordan, the respondent's conduct in failing to turn over his trial outline containing notes of conversations with Jordan, in stating or implying to the court that he had turned over all notes as ordered, and his failure to notify the court and defense counsel that he was withholding notes of conversations with Jordan violated Canon One, Disciplinary Rules 1-102(A)(4), (5), and (6); Canon Seven, Disciplinary Rules 7-102(A)(3) and (5), and 7-106(A); and S.J.C. Rule 3:08, PF 1, as set forth below.

134. The respondent's conduct in intentionally failing to produce his trial outline containing the Minnesota notes and other notes of his discussions with Jordan in violation of the court's order of August 14, 2003, was in violation of S.J.C. Rule 3:07, Mass. R. Prof. C. 3.4(c) and 8.4(c) and (d).

135. These Disciplinary Rules were in effect at the time of the misconduct and apply to these proceedings pursuant to Local Rule 83.6(4). They provide as follows:

## CANON ONE

### A LAWYER SHOULD ASSIST IN MAINTAINING THE INTEGRITY AND COMPETENCE OF THE LEGAL PROFESSION

**DR 1-102    Misconduct.**

    (A)    A lawyer shall not:

        (4)    Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

        (5)    Engage in conduct that is prejudicial to the administration of justice.

        (6)    Engage in any other conduct that adversely reflects on his fitness to practice law.

**DR 6-101    Failing to Act Competently.**

    (A)    A lawyer shall not:

        (3)    Neglect a legal matter entrusted to him.

**DR 7-102    Representing a Client Within the Bounds of the Law.**

    (A)    In his representation of a client, a lawyer shall not:

        (3)    Conceal or knowingly fail to disclose that which he is required by law to reveal.

        (5)    Knowingly make a false statement of law or fact.

**DR 7-103    Performing the Duty of Public Prosecutor or Other Government Lawyer.**

    (B)    A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment.

**DR 7-106    Trial Conduct.**

    (A)    A lawyer shall not disregard or advise his client to disregard a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding, but he may take appropriate steps in good faith to test the validity of such rule or ruling.

# STANDARDS RELATING TO THE PROSECUTION FUNCTION

**PF 1  Relations with the Courts and the Bar.**

It is unprofessional conduct for a prosecutor intentionally to misrepresent matters of fact or law to the court.

**PF 7  Disclosure of Evidence by Prosecutor.**

(a) It is unprofessional conduct for a prosecutor to fail to make timely disclosure to the defense of the existence of evidence, known to him, supporting the innocence of the defendant.  He should, at the earliest feasible opportunity, disclose evidence which would tend to negate the guilt of the accused or mitigate the degree of the offense or reduce the punishment.

(b) It is unprofessional conduct for a prosecutor intentionally to avoid pursuit of evidence because he believes it will damage the prosecution's case or aid the accused.

**Rule 3.4       Fairness to Opposing Party and Counsel**

A lawyer shall not:

(c)  knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists[.]

**Rule 8.4       Misconduct**

It is professional misconduct for a lawyer to:

(a)  violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b)  commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c)  engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(d)  engage in conduct that is prejudicial to the administration of justice[.];

WHEREFORE, Bar Counsel requests that this Honorable Court:

(1)      Issue an Order directing Jeffrey Auerhahn, Esq., to show cause to

this Court within thirty days from service of the notice, established by the date of

mailing of said notice, why he should not be disciplined;

(2)      After hearing, enter the sanction this Court deems required.

RESPECTFULLY SUBMITTED

Constance V. Vecchione
Bar Counsel

By

Nancy E. Kaufman
BBO#544384
First Assistant Bar Counsel
99 High Street
Boston, MA 02110
(617) 728-8740

August 28, 2009

## Certificate of Service

I, Nancy Kaufman, hereby certify that I caused a copy of this
document to be served on this 28th day of August, 2009, by first
class mail, postage prepaid, and by electronic mail as follows:

Michael D. Ricciuti, Esq.
Arnold R. Rosenfeld, Esq.
Michael DeMarco, Esq.
Ryan M. Tosi, Esq.
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
E-mail: michael.demarco@klgates.com
arnie.rosenfeld@klgates.com
michael.ricciuti@klgates.com
ryan.tosi@klgates.com

Nancy Kaufman

08/21/09                     COMMONWEALTH OF MASSACHUSETTS                     Page 1
                               SUPREME JUDICIAL COURT
                                FOR SUFFOLK COUNTY

                                    BA-087498

                              IN RE: Jeffrey Auerhahn

```
|   ENTRY DATE 06/08/79       CASE STATUS Admitted to bar               |
|  STATUS DATE 12/17/79       EXAM PERIOD               EXAM TYPE        |
|     REFD DATE               CEREMONY                  CER DATE         |
|     ADMITTED 12/17/79       BBO NO                                     |
|     LEAD CASE               RELATION                  PUBLIC y         |
```

 Jeffrey Auerhahn
 Applicant
 act 06/08/79 Notify

                          * * *  D O C K E T  * * *
--------------------------------------------------------------------------------
 PAPER DATE       ENTRY
 ------ --------  -------------------------------------------------------------

    06/08/79 For official docket information, see archived paper docket.

A True Copy

Attest

8-21-09            [signature]

Date                      Assistant Clerk

AUERHAHN, JEFFREY

*Admitted*    DECEMBER 17, 1979

SUPREME JUDICIAL COURT

COUNTY OF SUFFOLK

A True Copy

Attest

8-21-09

Date

Assistant Clerk



THE UNITED STATES OF AMERICA

**District of Massachusetts**

I, _____ Sarah Allison Thornton _____ Clerk of the United States District Court,

certify that

**Jeffrey Auerhahn**

was duly admitted and qualified to practice as an Attorney in the

District Court on the _____ 11th _____ day of _____ February _____, _____ 1980 _____.

In testimony whereof, I sign my name and affix the seal of this

Court, on this _____ 21st _____ day of _____ August _____, _____ 2009 _____.

_Sarah Allison Thornton_

Clerk