UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
    In the Matter of               )
                                    )   MBD NO. 09-10206-RWZ-WGY-GAO
    JEFFREY AUERHAHN                )
                                    )
                                    )
```

MEMORANDUM AND ORDER

PER CURIAM                                    September 15, 2011

## I.  INTRODUCTION

On December 9, 2010, this three-judge panel ("the Court")
heard oral argument on Bar Counsel's Petition for an order to
show cause why Respondent, Assistant United States Attorney
Jeffrey Auerhahn, ought not be disciplined pursuant to the Local
Rules of the District of Massachusetts governing attorney
discipline.  The Court expresses its appreciation both to Bar
Counsel and Auerhahn's counsel for their sensitive, vigorous
advocacy.  Counsel's fidelity to the record, complete
professionalism, and genuine understanding of the prosecution
function have been of inestimable value to the Court.

The Court has reviewed the findings, conclusions, and
recommendations for sanctions filed by Bar Counsel, as well as
the proposed findings and conclusions submitted by Auerhahn.

Upon thorough examination of the record and careful consideration of the arguments and explanations offered, a majority[1] of the panel concludes that the allegations of professional misconduct have not been proven by clear and convincing evidence, the standard of proof that we determine to be applicable.

### A.   Prior Proceedings

Following the prosecution and conviction of Pasquale Barone and Vincent Ferrara on various racketeering charges, both defendants filed petitions for habeas corpus alleging that Auerhahn had failed to disclose exculpatory evidence as required by law.

Judge Mark L. Wolf found the allegations plausible and subsequently convened and presided over an evidentiary hearing to explore their substance.  By letter dated October 2, 2003, United States Attorney Michael Sullivan requested that Judge Wolf defer making findings concerning misconduct by Auerhahn until the Office of Professional Responsibility for the Department of Justice ("OPR") had conducted its investigation. Resp. Mem. Supp. Mot. Dismiss, Ex. ("Resp.'s Ex.") A at A1-A2.

---

1 The Court is in complete agreement as to all aspects of this proceeding save one.  That disagreement is detailed infra at pp. 30, 33-34.

On October 3, 2003, Judge Wolf informed the parties that he would grant Barone's habeas petition.  Pet. ¶ 123.  Barone subsequently negotiated a plea agreement, later accepted by the court, pursuant to which he would plead guilty only to Count 2; counts 1, 3 and 4 were dismissed.  See R. 2019. Id. ¶ 124-25.

During the pendency of the OPR investigation, Judge Wolf wrote two letters to Attorney General Alberto Gonzales (which were posted on the dockets of the Barone and Ferrara habeas cases), calling attention Auerhahn's misconduct.  Id. at A3-A10. On April 12, 2005, Judge Wolf, based on findings highly critical of Auerhahn's professional conduct, allowed Ferrara's habeas petition, vacated his original sentence, and sentenced him to time served with three years of supervised release.  Ferrara v. United States, 384 F. Supp. 2d 384 (D. Mass. 2005) (Wolf, J.). The First Circuit subsequently affirmed this decision. Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006).

On January 10, 2005, the OPR issued a 112-page report finding that Auerhahn acted in reckless disregard of discovery obligations by failing to document the statements of a cooperating witness, Walter Jordan ("Jordan"), at a certain meeting in Utah, and exercised poor judgment by failing to comply with a court order to submit his notes from meetings with Jordan.  R. 1.  As a result, Auerhahn was privately disciplined

3

by Sullivan in the form a written reprimand.  Resp.'s Ex. A at A43.

By letter dated June 29, 2007, pursuant to L.R. 83.6(5), Judge Wolf requested that Bar Counsel initiate disciplinary action against Auerhahn. Id. at A31. Judge Wolf also wrote to Attorney General Gonzales again and informed him that the court was initiating the L.R. 83.6 process because he did not find the OPR sanction to be appropriate. Id. at A23-A30.  On the same day, the court did initiate L.R. 83.6 disciplinary proceedings by referring the matter to Bar Counsel.

Bar Counsel then investigated the matter by reviewing the pleadings and transcripts for the criminal cases and the habeas petitions, the materials OPR compiled for its investigation, and correspondence sent by Auerhahn to Bar Counsel, as well as by meeting with Auerhahn and persons with knowledge of this matter. On August 28, 2009, pursuant to L.R. 83.6(5)(C), Bar Counsel filed this Petition alleging probable cause to conclude that Auerhahn had engaged in professional misconduct.

Because Judge Wolf was the complainant in this matter, it fell to Judge Joseph L. Tauro, the senior active judge in this District, to discharge the responsibilities ordinarily performed by the Chief Judge, pursuant to L.R. 83.6(5)(D).  On November 25, 2009, Auerhahn filed an answer and a motion to dismiss.

4

Pursuant to the Local Rule, Judge Tauro appointed the present judge panel.  As thus constituted, the Court denied the motion to dismiss on January 22, 2010.

On July 7, 2010, the Court limited the Petition to two separate instances of alleged professional misconduct: (1) failing to preserve and disclose to defense counsel exculpatory evidence in the Ferrara and Barone prosecutions; and (2) failing to produce his trial outline in response to the court's order in the 28 U.S.C. § 2255 proceedings.  The Court established a record consisting of the OPR findings (but not its inferences or conclusions)[2] and such other primary evidentiary materials as the parties wished.  The parties filed briefs on the merits on October 13, 2010, and the Court held oral argument on December 9, 2010.

**B.   Governing Rules**

---

[2] Although Judge Wolf had the benefit of presiding over the criminal trial, observed the key witnesses firsthand during the habeas proceedings, and made thorough findings in support of his conclusions (all closer in time to the events in question), this Court did not include his findings in the record and finds the facts wholly independent of those findings.  The reason is two-fold.  First, Auerhahn was not a represented party in any of those proceedings.  Second, as explained below, this Court uses a heightened standard of proof in this proceeding.

The Petition filed by Bar Counsel, pursuant to L.R. 83.6(5), alleges that Auerhahn violated the disciplinary rules promulgated by the Supreme Judicial Court of Massachusetts.  The instances of alleged misconduct occurred in 1991 and 2003, over twelve years apart.  In the interim, the applicable rules of professional conduct were amended, and Bar Counsel was careful to refer to the rules in effect at the time of each instance. With regard to the 1991 purported failure to disclose exculpatory evidence, Bar Counsel alleges violations of the following rules: S.J.C. Rule 3:07, Canon One, DR 1-102(A(3),(4), (5), and (6); S.J.C. Rule 3:07, Canon Six, DR 6-101(A)(3); S.J.C. Rule 3:07, Canon Seven, DR 7-102(A)(3),(4),(5), and (6), DR 7-103(B), and DR 7-106; S.J.C. Rule 3:08, PF 1; S.J.C. Rule 3.08, PF 7(a) and (b)." Pet. ¶¶ 129-33.

Bar Counsel also alleges that Auerhahn violated amended S.J.C. Rule 3:07, Mass. R. Prof. C. 3.4(c), and 8.4(c) and (d) in August 2003 by failing timely to produce notes of witness interviews despite the Court's order to do so.  Pet. ¶¶ 109, 134.

### C.   Standard of Proof

The appropriate standard of proof for attorney discipline proceedings in the United States District Court for the District of Massachusetts has not heretofore been resolved.  Auerhahn urges this Court to apply a "clear and convincing evidence"

standard, while Bar Counsel suggests that a lower "preponderance of the evidence" standard is applicable.[3]   The clear and convincing evidence standard has been defined by the Supreme Court as:

> evidence which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

Cruzan by Cruzan v. Director, Mo. Dep't. of Health, 497 U.S. 261, 285 n.11 (1990) (internal punctuation and citations omitted). The preponderance of the evidence standard, in contrast, is defined as evidence which makes the assertion "appear more likely or probable in the sense that actual belief in its truth, derived from the evidence, exists in the mind or minds of the tribunal notwithstanding any doubts that may still linger there." Sargent v. Mass. Accident Co., 307 Mass. 246, 250 (1940).

---

[3] It is undisputed that Bar Counsel bears the burden of proof in these proceedings.  At oral argument, Bar Counsel urged this Court only to apply a lower standard of proof and did not attempt to argue that the burden ought be borne by the respondent.  Given the "importance of a lawyer's right to practice law" and the due process requirements, placing the burden of proof on Bar Counsel is appropriate.  See In re Barach, 540 F.3d 82, 85 (1st Cir. 2008); see also Schaffer v. Weast, 546 U.S. 49, 56 (2005) (noting default rule that party seeking court action must justify the request and, thus, bear the burden of proof); In re Balliro, 453 Mass. 75, 84 (2009) ("The burden of proof in a disciplinary proceeding is always on bar counsel.").

### 1.   Local Guidance

The Commonwealth of Massachusetts requires Bar Counsel to prove attorney misconduct by a preponderance of the evidence. Mass. R. B.B.O. §3.28.  Although federal case law in this jurisdiction fails to furnish any clear standard, the First Circuit has intimated that, while Massachusetts' preponderance standard does not offend due process, the clear and convincing standard might be more appropriate.  See In re Barach, 540 F.3d at 85-87 (deciding not to override Massachusetts' use of the preponderance standard in state discipline proceedings but noting that, if the court were "writing on a pristine page, [it] might have chosen some other standard.").

Local Rule 83.6, which governs disciplinary enforcement and allows this Court to impose sanctions including suspension and disbarment, provides no direct guidance as to the evidentiary standard Bar Counsel must meet in such proceedings.[4]  The rule does, however, state that a disbarred attorney seeking reinstatement must demonstrate "by clear and convincing evidence that he has the moral qualifications, competency and learning in

---

[4] The Local Rules for the Districts of Maine, D. Me. R. 83.3, New Hampshire, D.N.H. R. 83.5, DR-5, Puerto Rico, D.P.R. Civ. R. 83E, Rhode Island, D.R.I. R. 210, and Vermont, former D. Vt. R. 83.2, are similarly silent as to the standard of proof in attorney discipline proceedings.

the law required for admission to practice law." L.R.
83.6(7)(B). Although the standards for sanctions are not
directly related to those for reinstatement, where other
jurisdictions expressly state standards for both proceedings,
the standards are typically parallel (with the burden shifting
from Bar Counsel to Respondent). See, e.g., Colorado, D. Colo.
Crim. R. 57.7(G) (clear and convincing for attorney discipline);
D. Colo. Civ. R. 83.5(K)… (clear and convincing for
reinstatement); Connecticut, D. Conn. Civ. R. 83.2(d)(5) (clear
and convincing for attorney discipline); D. Conn. Civ. R.
83.2(i)(4) (clear and convincing for reinstatement). Deciding
to apply the clear and convincing evidence standard to attorney
discipline in this District would reflect a similar symmetry.

### 2. Clear and Convincing Standard is Majority Rule

Most jurisdictions require clear and convincing evidence in
attorney discipline proceedings. The majority of states[5] and

---

[5] States requiring clear and convincing evidence include:
Arizona, In re Lurie, 113 Ariz. 95 (1976); Connecticut,
Statewide Grievance Comm. v. Presnik, 215 Conn. 162 (1990);
Florida, Fla. Bar v. Hipsh, 441 So. 2d 617, 617 (Fla. 1983);
Illinois, In re Bossov, 60 Ill.2d 439 (1975); Indiana, In re
Cueller, 880 N.E.2d 1209, 1212 (Ind. 2008); Kansas, State v.
Turner, 217 Kan. 574 (1975); Louisiana, La. State Bar Ass'n v.
Edwins, 329 So.2d 437, 441-42 (La. 1976); Maryland, Bar Ass'n of
Balt. v. Posner, 275 Md. 250 (1975); Minnesota, In re Wang, 441
N.W.2d 488, 492 n.5 (Minn. 1989); Nebraska, State ex rel. Neb.
State Bar v. Cook, 277 Neb. 709 (1975); New Jersey, In re Gross,
67 N.J. 419 (1975); Ohio, Akron Bar Ass'n v. Catanzarite, 119

many federal districts apply this higher standard.  Of the
eleven districts where local rules articulate a standard of
proof, eight require clear and convincing evidence.[6]  Even where
local rules are silent, federal courts have nonetheless
recognized clear and convincing evidence as the applicable
standard.  See Sealed Appellant 1 v. Sealed Appellee 1, 211 F.3d
252, 254-55 (5th Cir. 2000); In re Madrano, 956 F.2d 101, 102
(5th Cir. 1992); Romero-Barcelo v. Acevedo-Vila, 275 F. Supp. 2d
177, 192 (D.P.R. 2003); New Eng. Ins. Co. v. Sylvia, 783 F.
Supp. 6, 10 (D.N.H. 1991).

The American Bar Association, whose Model Rules and Model
Code have provided the basis for the Massachusetts ethical
rules, also supports the use of the clear and convincing
evidence standard in discipline proceedings.  See ABA Standards

---

Ohio St. 3d 313 (2008); Oklahoma, State ex rel. Okla. Bar Ass'n
v. Besly, 136 P.3d 590, 594 (Okla. 2006); Oregon, In re Gygi,
273 Or. 443 (1975); and South Carolina, In re Friday, 263 S.C.
156 (1974).  Massachusetts is one of the few jurisdictions to
apply the preponderance of the evidence standard. See Barach,
540 F.3d at 85 (noting that the Massachusetts rule is a
"minority" rule).

[6] Colorado, D. Colo. Crim. R. 57.7(G), Connecticut, D. Conn.
Civ. R. 83.2(d)(5); Kansas, D. Kan. R. 83.6.3(f)(2)(D); Montana,
D. Mont. R. 83.14(d)(5)(E); New Jersey, D.N.J. Civ. R.
104.1(e)(14); New York, S.D.N.Y. R. 1.5(b); Washington, W.D.
Wash. R. 2(f)(5)(F)(iii); District of Columbia, D.C Civ. R.
83.16(d)(8).  But see Michigan, E.D. Mich. R. 83.22(e)(6)(E)
(preponderance of the evidence), W.D. Mich. Civ. R.
83.1(k)(ii)(B)(3) (preponderance of the evidence); Utah, D. Utah
Civ. R. 83-1.5.7(e) (preponderance of the evidence).

For Imposing Lawyer Sanctions (A)(1.3) (1992); Model Rules for
Lawyer Disciplinary Enforcement R. 18(C).

### 3. Rationale for the Clear and Convincing Standard

Typically, in an administrative or civil proceeding, proof
by a preponderance of the evidence is sufficient to protect the
interests at stake, while in criminal cases, due process
requires proof beyond a reasonable doubt. Because attorney
discipline proceedings carry the potential for disbarment, the
evidentiary standard is appropriately placed between these civil
and criminal standards. See In re Madrano, 956 F.2d at 102.
Requiring a higher quantum of proof, like clear and convincing
evidence, recognizes the gravity of limiting an individual's
right to practice in his or her chosen profession, while
balancing the need to protect the public from unfit
practitioners. See In re Palmisano, 70 F.3d 483, 486 (7th Cir.
1995) ("Disbarment is costly for an attorney, but permitting an
incompetent or otherwise inappropriate person to practice law is
costly for clients and the administration of justice."); In re
Wang, 441 N.W.2d 488, 492 (Minn. 1989) ("We trust that in all
professional disciplinary matters, the finder of fact, bearing
in mind the gravity of the decision to be made, will be
persuaded only by evidence with heft."); Ettinger v. Bd. of Med.
Quality Assurance., 185 Cal. Rptr. 601, 604 (Cal. Ct. App. 1982)

11

("It seems only logical to require a higher standard of proof
[than a preponderance of the evidence] when dealing with
revocation or discipline of a professional licensee.").

For these reasons, this Court will apply the "clear and
convincing evidence standard" required by the majority of courts.
This standard logically fits with this Court's local rules and
fairly balances due process, the rights of the attorney, and the
interests of the public.

## II. FINDINGS OF FACT and RULINGS OF LAW

After thorough consideration of the factual record and the
arguments made in the briefs and at the oral hearing, the Court
finds the following facts and makes the rulings below.

### A.   Background

Auerhahn was admitted to the Massachusetts bar in 1979 and
to the bar of the United States District Court for the District
of Massachusetts in 1980.  Ans. ¶ 1.  During his first year as
an attorney, Auerhahn worked for the Ward Commission
investigating corruption in state government.  R. 62.  Auerhahn
then was employed as a Middlesex County assistant district
attorney for four years.  Id.  In 1985, he was hired by the
Department of Justice as a special attorney assigned to the
Organized Crime and Racketeering Section of the New England
Strike Force ("Strike Force") of the United States Attorney's

Office for the District of Massachusetts. Ans. ¶ 2. He remained with the Strike Force until 2005 when he was reassigned to another unit with the U.S. Attorney's Office, where he remains to this day. Ans. ¶ 3.

Among Auerhahn's duties while with the Strike Force were the investigation and prosecution of members of the Patriarca crime family of La Cosa Nostra ("LCN"), an organized criminal enterprise operating, among other places, in Boston's North End neighborhood. Ans. ¶ 4. Early in his career with the Strike Force, Auerhahn became the lead attorney in an investigation into whether Vincent "Vinny" Ferrara ("Ferrara"), a "soldier" in LCN, was involved in the 1985 murder of Vincent James "Jimmy" Limoli ("Limoli"), an associate in a crew under Ferrara's direction. Ans. ¶ 8.

In his investigations for the Strike Force, and on the Ferrara investigation in particular, Auerhahn worked closely with Martin Coleman, a Boston police department detective, and Michael Buckley, an FBI special agent, both assigned to the Strike Force. R. 501-02; Pet. ¶ 12. Auerhahn also worked with Gregg Sullivan, another Assistant United States Attorney on the Ferrara investigation. R. 709, 1013, 1426.

In the early 1980s, Jordan and Pasquale "Patsy" Barone ("Barone") were associates of the Patriarca family and worked for

Ferrara.  Ans. ¶ 9.  Jordan, Barone, and the decedent Limoli
became friends.  Jordan and Barone were in-laws and roommates,
and Limoli was the best man at Barone's wedding and godfather of
Barone's child.  R. 1346.  By 1985, however, Limoli's
relationships with Jordan and Barone had soured.  Limoli had
botched a theft that left Barone out $30,000, and Limoli had
assaulted Jordan on one occasion and stabbed him on another.  R.
1326, 1367.  On October 28, 1985, Limoli was murdered.  Ans. ¶
10.  Barone and Jordan were both seen with Limoli shortly before
his murder, and both fled Boston soon after the murder.  Ans. ¶
10.

Ferrara initially came under Strike Force investigation for
extortion of bookmakers; the scope of the probe was later
expanded, however, when claims surfaced that Ferrara was
potentially involved in ten to twenty murders.  R. 68-69.  In
furtherance of the investigation into these murders, Jordan was
arrested in North Carolina on a material witness warrant on July
20, 1988.  Ans. ¶ 13.  Upon being arrested, Jordan quickly began
cooperating with the government and provided the Strike Force
with information on Ferrara and LCN generally.  R. 4, 503, 1594-
95.  On or about July 26, 1988, Jordan entered into an agreement
with the United States Department of Justice, represented by
Auerhahn, regarding his cooperation in the Ferrara

14

investigation.  Under the agreement, Jordan was to provide full

and truthful knowledge regarding Ferrara and his enterprise to

the government in exchange for nearly full immunity from any

related criminal case and entrance into the Federal Witness

Protection Program.  R. 1300-01.

### 1.   Jordan's Statements in Initial Interviews and Grand Jury Testimony

In his cooperation with the government, Jordan spoke with

several members of the Strike Force.  Jordan admitted to having

been involved in Limoli's murder and explained that Barone killed

Limoli on Ferrara's orders because Limoli had stolen a bag

containing cocaine, money, and guns from another LCN associate.

R. 1304.  Jordan's sole source of information as to Ferrara's

involvement in the Limoli murder was Barone.  R. 1304-22.

On July 27, 1988, one week after his arrest, Jordan

testified before the grand jury to the details of the murder of

Limoli.  Jordan testified that Barone told him that Limoli had

"gotten the 'X'" and was no longer "under Vincent Ferrara's wing"

because of Limoli's theft.  R. 1602.

With regard to the murder itself, Jordan admitted that

Barone asked him to help by setting up a meeting with Limoli.

R. 6.  Jordan arranged the meeting with Limoli on the pretense

of consummating a drug deal with a third party.  Instead, Barone

met up with Limoli on his way to the supposed drug deal and shot

In his cooperation with the government, Jordan spoke with several members of the Strike Force. Jordan admitted to having been involved in Limoli's murder and explained that Barone killed Limoli on Ferrara's orders because Limoli had stolen a bag containing cocaine, money, and guns from another LCN associate. R. 1304. Jordan's sole source of information as to Ferrara's involvement in the Limoli murder was Barone. R. 1304-22.

On July 27, 1988, one week after his arrest, Jordan testified before the grand jury to the details of the murder of Limoli. Jordan testified that Barone told him that Limoli had "gotten the 'X'" and was no longer "under Vincent Ferrara's wing" because of Limoli's theft. R. 1602.

With regard to the murder itself, Jordan admitted that Barone asked him to help by setting up a meeting with Limoli. R. 6. Jordan arranged the meeting with Limoli on the pretense of consummating a drug deal with a third party. Instead, Barone met up with Limoli on his way to the supposed drug deal and shot and killed Limoli. R. 6, 1612.

Jordan also testified to several meetings in the days before and after the murder. Several days before Limoli's murder, Jordan was in a car with Barone and another LCN member named Joseph Bottari ("Bottari"). In this conversation, Barone solicited Bottari's assistance in the murder, saying that "Jimmy

16

had to be clipped" and that Ferrara had ordered the hit.
R. 1605-06.  Bottari refused to help Barone with the murder.
R. 1606.

A few days after the Limoli murder, Jordan and Barone met
with Ferrara in a black Lincoln automobile.  R. 5, 1621.
Ferrara was in the front seat with another man who was unknown
to Jordan.  Id.  Ferrara began asking questions about the Limoli
murder that made it appear he was uninvolved.  Id.  Jordan said
that he was confused by Ferrara's questions and thought Ferrara
was trying to hide his involvement in the murder from the
unknown man.  Id.

A day or two after the meeting in the black Lincoln, Barone
was summoned to Francesco's Restaurant to meet with Ferrara.
R. 1620.  Barone returned from Francesco's within 30 minutes,
"hysterical", and told Jordan that they needed to leave town
immediately because Ferrara was going to kill them.  R. 1620-21.
According to Jordan, Barone told Jordan that he did not know why
Ferrara wanted to kill them.  R. 1626.

Following Barone's meeting at Francesco's, Jordan and Barone
left Boston on or about November 5, 1985.  Ans. ¶ 10.  Jordan
went to Myrtle Beach, South Carolina.  R. 6.  In the summer of
1986, Barone visited Jordan in South Carolina.  Id.  In his
initial interviews, Jordan told Buckley that while they were in

South Carolina, Barone discussed killing Limoli and always
asserted that Ferrara had ordered the hit.  Id.

    After his grand jury testimony, Jordan was relocated to
Maine to await federal witness protection services.  During this
time, Jordan met extensively with members of the Strike Force,
including Auerhahn.  Id.  The FBI reports on these interviews
indicate that Jordan consistently told the same story about
Ferrara ordering the murder of Limoli.  See R. 1307.

### 2. Barone's Arrest and Statements

    Barone was arrested in Ohio on July 22, 1988, and was
interviewed by two members of the Strike Force.  R. 1749.
Although Barone initially appeared inclined to cooperate, he
later ceased all cooperation.  In his brief period of
cooperation with the government, he largely corroborated Jordan's
accounts.  Although he denied any involvement with Limoli's
murder, Barone stated that the reason for Limoli's murder was
Limoli's theft.  R. 1749-51.  Barone also confirmed the meetings
with Ferrara in the black Lincoln and at Francesco's.  Id. 1754-
55.

### 3. Indictments of Ferrara and Barone

    Following further investigation, in March 1990, Barone and
Ferrara were among eight defendants named in a sixty-five count
superseding indictment filed in the United States District Court

18

for the District of Massachusetts.[7]   R. 9 & n.13.   Several of
these counts related to Ferrara and Barone's involvement in
Limoli's murder.   See United States v. Raymond J. Patriarca et
al., CR. No 89-00289-MLW; R. 1833.   In order to establish larger
RICO charges, the government had to establish a pattern of
racketeering and thus had to prove that Barone had conspired
with Ferrara and others to murder Limoli in order to gain,
maintain, or advance their positions within the Patriarca
family.   R. 1846-63.   The government's main theory was that
Barone murdered Limoli on Ferrara's instruction in order to move
up in the LCN and that Ferrara had ordered the hit to vindicate
the theft from a "made" LCN member.   R. 1897.   Jordan's testimony
as to Barone's statements that Ferrara had ordered the hit was,
therefore, crucial to the indictment.

    We now turn to the events central to this disciplinary
proceeding against Auerhahn.

    **B.   Utah Meeting**

    Between 1988 and 1991, Jordan was in the witness protection
program.   In anticipation of the Barone/Ferrara trial scheduled
to begin in September, 1991, Auerhahn, Sullivan, Coleman, and
Buckley went, from July 22 to 24, 1991, to meet Jordan in Salt

-----

[7] On June 6, 1989, Barone pleaded guilty in Suffolk County
Superior Court to manslaughter in connection was Limoli's death
and was sentenced to six to ten years in state prison.   Ans.
¶ 15, R. 1900.

Lake City, Utah, to prepare his testimony ("Utah meeting").  R.
10.  Auerhahn and Sullivan took copious notes during the three
days of meetings ("Utah notes"), but Coleman and Buckley did not
take any notes.  R. 1323-54.  This was in line with the Strike
Force procedures for trial preparation.  R. 10-11.

In these interviews, Jordan again told the Strike Force
members about the Francesco's meeting and about Barone's visiting
him in Myrtle Beach, South Carolina, after they fled Boston.
Jordan explained that when, in South Carolina, he again asked
Barone about why Ferrara wanted to kill them, Barone said he did
not know.  R. 1348-50.  Jordan also told the Strike Force that
his parents told him that Barone was supposed to kill Jordan the
night they killed Limoli because Jordan was a witness.  R. 1350.
These statements are all reflected in the Salt Lake City notes.
R. 1323-54.  Concerned that Jordan appeared to be waffling about
the crucial link to Ferrara, Sullivan told Coleman to talk to
Jordan and make sure he stuck to his earlier story that Ferrara
had ordered the Limoli hit.  R. 507-08, 568-69, 1261.

C.   **Jordan's Conversation in Utah with Coleman**

Late on the night of July 24, 1991, Jordan visited Coleman
in his hotel room.  Of the Strike Force members, Jordan felt
closest to Coleman.  Jordan disclosed that he had withheld
certain information concerning Ferrara's involvement in the

20

Limoli homicide.  R. 11.  The substance of this conversation is
sharply disputed.  According to Bar Counsel, Jordan told Coleman
that after Barone returned from Francesco's, Barone told Jordan
Ferrara wanted to kill them because Barone had not gotten
Ferrara's permission to kill Limoli and thus they had to flee
Boston (the "no permission Statement").  R. 969, 1299.  According
to Bar Counsel, Jordan thus admitted to lying when he said and
testified before the grand jury that Barone had told him Ferrara
had ordered the hit and that he did not know why Ferrara wanted
to kill them.  In support of this contention, Bar Counsel points
to a handwritten memorandum, purportedly authored by Coleman
(Exhibit 17).  R. 1299.  According to the memorandum, Jordan told
Coleman that when Barone returned from Francesco's, Jordan
learned that Barone "had fucked up, and did not get permission to
kill Jimmy Limoli."  Id.

     Bar Counsel correctly argues that the "no permission"
statement is directly exculpatory of Ferrara's involvement in
Limoli's murder.  Under the applicable Local Rule, the government
must disclose "all exculpatory evidence within the meaning of
Giles v. Maryland, 386 U.S. 66 (1967), and Brady v. Maryland,
373 U.S. 83 (1963)."  L.R. 42 (as enacted prior to Sept. 1990)
(superseded on September 1, 1990, by L.R. 116.1, adding only a
citation to Giglio v. United States, 405 U.S. 150 (1972)).

Under Brady, evidence is exculpatory if it is "material either to guilt or to punishment." 373 U.S. at 87. In Giglio, the Court explained that evidence must be disclosed if it could "in any reasonable likelihood [affect] the judgment of the jury." 405 U.S. at 154 (quoting Napue v. Illinois, 360 U.S. 264, 271 (1959)). If Barone told Jordan that Ferrara wanted to kill them because Ferrara had not ordered the murder of Limoli, a fair portion of the government's RICO case would have crumbled. This statement, if believed, would have absolved Ferrara of any involvement in the Limoli murder or its racketeering implications. Bar Counsel properly makes much of the "no permission" statement, and the Court gives this version of events the serious consideration it is owed.

In these proceedings, Bar Counsel bears the burden of proving all facts by clear and convincing evidence. Although the Court finds that Coleman and Jordan had a conversation on the night of July 24th, the contents of this conversation have not been proven. The handwritten memorandum is of little assistance. The evidence simply does not convincingly establish when it was written or what motive there might have been for drafting it. This is especially true in light of Coleman's undisputed aversion to writing memoranda. See R. 1210, 1503, 1735.

Auerhahn was not a party to the July 24 conversation between Jordan and Coleman.  The substance of the conversation is thus irrelevant to Auerhahn's actions or motivations unless he had knowledge of it.  We turn now to this issue.

### D.   Coleman's Conversation in Boston with Auerhahn

By July 26, 1991, the Strike Force members had returned to Boston.  Coleman asked to meet privately with Auerhahn to report about his visit with Jordan in Utah.  When Coleman arrived to their meeting, Auerhahn saw that he was "very agitated" and "almost near tears."  R. 134-36, 834-35.  Auerhahn even worried that Coleman was "going to have a heart attack" he was so upset.  R. 143.  Coleman reported to Auerhahn that Jordan had expressed discomfort or uncertainty with some of the testimony he was to give regarding the Limoli murder.  R. 835.

Bar Counsel alleges that in this meeting, Coleman told Auerhahn that "information had been withheld, that Barone had said that [Ferrara] did not order the hit."  In other words, Bar Counsel alleges Coleman relayed Jordan's "no permission" statement to Auerhahn in this meeting.

Auerhahn counters that Coleman never told him the details of Jordan's statements.  R. 11.  Instead, he claims that because Coleman was so upset, he did not ask Coleman specifically what was said, but admits that Coleman did tell him generally that

23

Jordan had come to him in his hotel room and admitted to
withholding some information R. 143.   Auerhahn claims that he
told Coleman to calm down, that they would figure out what
Jordan said and deal with the repercussions of it.   R. 11, 149.
Auerhahn did not have Coleman document what Jordan told him in
Utah.   R. 869, 884-85.

Bar counsel alleges that, after meeting with Coleman,
Auerhahn knew of the "no permission" statement by Barone and was
therefore in possession of exculpatory evidence with respect to
Ferrara.   If true, his failure to "preserve and to make timely
disclosure to Barone's and Ferrara's defense counsel defense, and
[his] asserting to defense counsel and permitting the government
to assert to the court that the government was providing all
exculpatory evidence" violated the rules of professional conduct.
Pet. §130.

The Court does not find by clear and convincing evidence
that Coleman told Auerhahn that Jordan had retracted his
statement that Barone implicated Ferrara as ordering the Limoli
murder.   Although this Court is persuaded that Coleman met with
Auerhahn in Boston after the Salt Lake City meetings and that
Coleman was visibly upset, it has not been proven what Coleman
specifically told Auerhahn.   Without convincing evidence that
Auerhahn had knowledge of Jordan's exculpatory statements as of

the end of his meeting with Coleman, the Court concludes that
Bar Counsel's charges found in paragraphs 129 and 130 of her
Petition, insofar as they pertain to the "no permission"
statement, are not proven.

**E.   Auerhahn's Follow Up to the Coleman Conversation**

After his meeting with Coleman, Auerhahn decided he needed
to figure out whether Jordan had been telling the truth about
Barone's statements or merely telling him what he wanted to
hear.  Auerhahn arranged for Jordan to telephone from witness
protection on July 29, 1991, and both Auerhahn and Coleman were
present for the phone call.

Bar Counsel argues that in this phone call, Jordan told
Auerhahn directly  the "no permission" statement. In support of
this contention, she again cites Exhibit 17, the handwritten
memorandum, which states:

> On Monday July 29, 1991 at about 10:30 AM, Mr. Jordan
> returned a call to Mr. Auerhahn office [sic] and I ask
> [sic] him to repeat to AUSA Mr. Auerhahn what he had
> said to me on July 24.
> At this time Mr. Jordan stated that he knew that
> Pattsie [sic] Barone had not gotten permission to kill
> Jimmy Limoli.  He found this out when after Jimmy's
> wake Patty's [sic] and he got into a car with Vinny
> Farrar [sic] and a Joe the Jeweler.
> Vinny said to Patty's [sic] "Who's next me?"   Jordan
> furter [sic] stated that some time later that week
> that Patty's [sic] got called over to Franchesco's [sic]
> and Vinny told him we was dead.   At this time Patty's
> [sic] ran out of Franchesco [sic], a rest. On N.
> W[undecipherable] St. and over to his apartment were
> [sic] Jordan was . . .  and told Jordan that they had

25

> to get out of town because Vinny was going to kill
> them.  Jordan then said why is he going to kill us and
> Patty's [sic] said because I did not get permission to
> kill Jimmy.

R. 1299.

Auerhahn did not recall any specifics of his phone call

with Jordan, but he was adamant that the call would not have

included the substance of any changed testimony because such

sensitive discussions would have taken place face-to-face.  R.

13.

As noted above, the Court does not find this memorandum to

be of assistance in determining the substance of the telephone

call between Auerhahn, Jordan, and Coleman.[8]  The substance of

---

[8] The Court also finds that it has not been proven that this
memorandum was ever given, in any form, to Auerhahn or that
Auerhahn was ever aware of its contents.  Coleman testified that
he had this handwritten memorandum typed up and given to
Auerhahn.  R. 978, 984.  Auerhahn denied ever having received a
memorandum from Coleman regarding Jordan's changed statement.  A
typewritten memorandum, dated September 4, 1991, was also found.
R. 1298.  Although the typewritten memorandum purports to be
from Detective Coleman, and was found in Coleman's filing
cabinet, Coleman denied ever having seen it and no other witness
could identify the author.  Like the handwritten memorandum,
the typewritten memorandum documents Jordan's revelation to
Coleman in Utah that Ferrara had not ordered the hit but
contains fewer details about the disclosure than indicated in
the handwritten memorandum.  The typewritten memorandum also
documents the meeting between Coleman and Auerhahn on July 26,
1991, and the phone call between Jordan, Coleman, and Auerhahn.

Who created the typewritten memorandum has not been proven.
It has also not been proven that this memorandum was ever shown
to Auerhahn or that he was ever made aware of its contents.
Therefore, insofar as Bar Counsel alleges, in paragraph 131 in

this telephone call has not been proven by clear and convincing evidence, and the Court does not conclude that Auerhahn was in possession of specific exculpatory evidence at the conclusion of this telephone call.[9]

### F. Minnesota Meeting

Whatever the substance of the telephone conversation with Jordan, Auerhahn arranged a face-to-face meeting with him in Minneapolis, Minnesota, which occurred on August 27 and 28, 1991 ("Minnesota meeting") R.909, 1289-90.  This meeting was also attended by Coleman and Buckley.  R. 13.

Auerhahn testified that in Minnesota, Jordan told him about an event in Myrtle Beach, South Carolina, where Barone said that Ferrara had not ordered the hit on Limoli but immediately retracted that statement or said that he was joking (the "Myrtle Beach statement").  According to Auerhahn, Jordan was "flip-flopping" in the Minnesota meeting as to whether, in South

---

her Petition, that Auerhahn committed any misconduct with regard to this memorandum, the allegations have not been proven.

[9] In his testimony during the habeas hearings, Auerhahn did note, however, that he would have confirmed in this telephone call whether Jordan had switched his story at all, and thus whether they needed to meet with him.  R. 873.  Given that Auerhahn did indeed schedule a follow-up meeting with Jordan (discussed below), the Court notes without finding that it is likely Jordan told Auerhahn something sufficiently troubling to cause him to fly out to meet with Jordan even though he was scheduled to begin the Patriarca trial within a few days.

Carolina, Barone said Ferrara did or did not order the hit.  R. 171, 183, 223-24.

As in Utah, the agents did not take notes.  Auerhahn took notes, but not as copiously as he had in Utah.  R. 13.  Rather than creating a separate set of notes from the meeting, as was his practice, Auerhahn added the information he garnered at this meeting to a trial outline he had begun to prepare at some point after the phone call with Jordan ("Minnesota notes").[10]  R. 1083, 1090. Most of the notes reflect Jordan's original account.  For example, the outline indicates that Barone "wouldn't say why" Ferrara wanted to kill Barone and Jordan.  R. 1391.  The outline also reflects a few other statements, however.  One note says that Barone told Jordan that they had to leave Boston because Jordan was also supposed to get "whacked."  R. 1392.  Another note states that Ferrara might have wanted to kill them because he "didn't approve or order murder" but notes that this was said "in South Carolina one time" and that Jordan "pressed [Barone] on it."  R. 1392.  The notes do not make any mention of Barone retracting or otherwise indicating he was joking about Ferrara not ordering the hit in the South Carolina discussion.

---

[10] The notes on the outline are written in different colored inks.  Although this suggests that the notes were taken at different times, there is no evidence as to which notes were added before, during, or after the Minnesota meeting.

Auerhahn was days away from trial when he met with Jordan in Minnesota.  It is understandable that Auerhahn's notes may have involved only minimal adjustments to his trial outline and plan.  The Court notes that Auerhahn may have viewed the "Myrtle Beach statement" as an immaterial or only marginally material inconsistency that did not require extensive attention in his trial outline. The Court finds that as of August 28, 1991, at the latest, Auerhahn was aware of some strain of the "Myrtle Beach statement".  That is, the Court finds that Auerhahn was aware of a version of events where Barone once said in South Carolina that Ferrara did not order the hit, and that, in some way, Jordan minimized the impact of this statement.

This version of what Barone said to Jordan was mildly exculpatory both on its face and as an inconsistency with Jordan's other testimony, see Giglio, 405 U.S. at 154; Brady, 373 U.S. at 87, but it is not likely that, without more, it would have substantially affected the jury's decision, especially because the rest of Jordan's testimony tended to inculpate Ferrara.

The "Myrtle Beach statement" nonetheless qualifies as exculpatory evidence that must be disclosed under the law of this jurisdiction and pursuant to our Local Rules.  See United

States v. Osorio, 929 F.2d 753, 757-58 (1st Cir. 1991); United States v. Peters, 732 F.2d 1004, 1008 (1st Cir. 1984).

   **G.   Auerhahn's Alleged "Intentional Avoidance" of Damaging Evidence**

   The majority of the panel is unable to agree with Bar Counsel that it has been demonstrated that Auerhahn violated SJC Rule 3:08, PF 7(b), which, at the time, provided that "[i]t is unprofessional conduct for a prosecution's intentionally to avoid pursuit of evidence because he believes it will damage the prosecutor's case or aid the accused." Bar Counsel's position is that Auerhahn knew that the "Myrtle Beach statement" was not an accurate summary of what Jordan had said to Coleman about Barone's purported statement that Ferrara had not ordered the Limoli murder, and that Auerhahn deliberately avoided pursuing the matter with Jordan in order to keep relevant exculpatory evidence from the defense.

   On the record evidence, we do not conclude that Auerhahn knew that Jordan had made the statements referred to as the "no permission statement" (if Jordan in fact did so). We simply find the evidence too unreliable and inconsistent to meet the standard of proof that we have adopted.

   Bar Counsel relies heavily on the handwritten memorandum identified in the 2003 habeas proceedings as Exhibit 17. As

noted above, the Court is not persuaded by the evidence that
Auerhahn ever saw that memorandum. While Coleman testified that
he wrote the memorandum, it is unclear when he did so and under
what circumstances. He further testified that he gave the
memorandum to Auerhahn, but Auerhahn testified that Coleman did
not give him the memorandum. The evidence does not enable us to
confidently resolve that conflict in the testimony in Bar
Counsel's favor, and certainly not to the requisite level of
conviction. The late discovery of the memorandum in a file
cabinet used by Coleman suggests the memorandum was not handled
in accordance with normal Strike Force record keeping
procedures. If, having seen the memorandum, Auerhahn had some
sinister purpose to hide it, the wastebasket would have served
that purpose better than Coleman's file cabinet.

Moreover, Coleman's testimony about the memorandum was not
fully consistent with Bar Counsel's argument. On at least two
occasions, Coleman testified about the contents of the
handwritten memorandum as if it recorded the "Myrtle Beach
statement," which is not accurate. See R. 626, 631.

In short, the record evidence about the provenance,
accuracy, and handling of the handwritten memorandum is simply
too unclear to be convincing support for the proposition that

the memo or its specific contents were communicated to Auerhahn
by Coleman.

That proposition is central to Bar Counsel's argument that
Auerhahn violated PF 7(b), and the Court's rejection of it is
the fundamental basis for our disagreement with the argument.
Because we do not accept that Auerhahn had seen the memorandum
and thus knew its contents, we cannot say, as Bar Counsel would,
how much the "Myrtle Beach version," which Auerhahn acknowledges
knowing, differed from some other, more seriously exculpatory
version Coleman might have told Auerhahn. Whereas Bar Counsel
compares what she regards as the fixed content of two distinct
versions of what Jordan told Coleman and draws inferences from
the significant difference between them, we find reliable
evidence only of one fixed version, the "Myrtle Beach version,"
and a lot of inconclusive evidence about what Coleman may have
orally reported to Auerhahn. Given our view of the evidence, we
are not able to make the same sort of direct comparison of
distinct versions that Bar Counsel makes.

Nor does the majority think that sound inferences as to
what Auerhahn knew can be drawn from the facts concerning
Coleman's emotional agitation when he first reported to Auerhahn
that Jordan had told him something that was troubling. Bar
Counsel argues that it can be inferred from Coleman's state of

upset that Jordan must have told him something seriously
damaging to the government's case. That inference is certainly
plausible, but Auerhahn proposes another possible inference from
the same facts. In his testimony in the course of the OPR
investigation, Auerhahn suggested that a reason Coleman was so
upset was that Jordan, by "confiding" his new information to
Coleman alone, had put the burden of that information solely and
squarely on Coleman's shoulders, and it was having that
responsibility that flustered Coleman. See R. 221-222.[11] This is
a plausible enough inference that it deters us from being
clearly convinced that Coleman's agitation was the result of the
content of Jordan's revelation, rather than Jordan's tactics.
Consequently, we are not able to draw the inference about
Auerhahn's state of mind that Bar Counsel urges.

    After Coleman told Auerhahn whatever he told him, a
majority of the panel considers Auerhahn's course of action in
investigating the matter was generally appropriate. He promptly

---

11 "At the time in the meeting in the office, he was angry that on the one
hand that Walter sort of put this burden on him and told him something in
confidence which obviously can't stay in confidence. But also at the same
time he was also wondering if he was - is this kid playing me? In other
words, trying to discredit himself as a witness to save himself from having
to testify, that is, Walter using Marty to do it in a surreptitious manner,
so to speak. So Marty seemed angry that the burden was placed on him to deal
with this issue, and unsure if Walter was playing a game, so to speak. . . .
It seemed he was more upset that it was made to him without anybody else
being there. . . . It seemed it became his burden to do something to deal
with it. He even said, I should have woke you up and dragged you out of bed
and made him tell you directly."

talked by phone with Jordan and then traveled with agents to meet personally with Jordan to re-interview him.

One member of the panel, however, would find that Jordan told Coleman the "no permission" statement in Utah, that this explains Coleman's extreme agitation when reporting to Auerhahn, and that, at a minimum, Auerhahn should have inquired directly of Coleman after the Minnesota meeting as to what Jordan had told Coleman in Utah. In the view of this panel member, Auerhahn's failure to do so violated S.J.C. Rule 3:08, PF 7(b) and warrants a sanction. Like the majority, this member of the panel concludes that it has not been proven that Auerhahn ever had actual knowledge of the "no permission" statement.

Auerhahn can fairly be faulted, however, for failing to document more carefully what Jordan said to government agents, including Auerhahn himself. If the issue was important enough for Auerhahn to travel to Minnesota to meet with Jordan face to face, it was important enough for him to adequately memorialize the substance of the meeting. It appears that the only written notes that exist from that meeting took the form of additions or amendments to the trial outline Auerhahn had started to prepare in anticipation of the upcoming trial. In the circumstances, that was too casual an approach for him to take to the matter. While it may be that neither prosecutors nor agents typically

34

generate written reports after trial preparation sessions with witnesses, the Minnesota meeting was not just another trial prep session. It was a specially called meeting to address a particular issue that might have weakened the prosecution's case. Auerhahn's failure to take care to assure that a proper record of the matter was made was a failure of due diligence for which he is appropriately criticized.

Want of diligence, however, is not equivalent to the "intentional avoidance" of evidence that is sanctionable under PF 7(b), and proof of want of diligence is not in the present context proof of professional misconduct.[12]

### H.   Disclosure of the "Myrtle Beach Statement"

In preparation for the trial in the matter of United States v. Patriarca et al., Auerhahn filed a trial brief on October 16, 1991, setting forth the evidence upon which the government planned to rely in the case against the defendants.   R. 1887-904.   In this brief, Auerhahn represented that Jordan would "testify to Barone's statement that Limoli was killed on the orders of Vincent Ferrara."   R. 1897.

---

12 Nor do the facts of this case justify a conclusion that Auerhahn violated SJC Rule 3:07, Canon 6, DR 6-101(A)(3) ("A lawyer shall not . . . [n]eglect a legal matter entrusted to him."). We think that to be in sanctionable violation of that rule the "neglect" of the "legal matter" must be considerably more thoroughgoing than the instance of negligent record-making that we find in this case.

The trial did not begin in the fall of 1991 as planned. On January 22, 1992, Ferrara pleaded guilty to, among other charges, murder in aid of racketeering and conspiracy to commit murder in the homicide of Limoli, and was sentenced to twenty-two years in prison. Prior to these events, Auerhahn had never disclosed the Myrtle Beach version to Ferrara's counsel.

In May 1992, Patriarca pleaded guilty to several charges and was facing sentencing. Auerhahn wrote a letter, dated May 8, 1992, to Patriarca's attorney,[13] providing discovery material in connection with the sentencing hearing, in which he stated:

> Shortly after the murder, Jordan fled Boston at the direction of Barone. (Barone fled as well.) Some time later, Jordan learned the reason why he and Barone were forced to flee. Jordan learned that Barone was supposed to use Jordan to set up Limoli and then kill Limoli and Jordan on the night of October 28, 1985. For failing to follow the order from Vincent M. Ferrara, and for sparing the life of his brother-in-law, Barone had incurred the wrath of Ferrara and proven to be unreliable. Therefore, both Barone and Jordan were in jeopardy if they remained in Boston. On one occasion, however, Barone provided a different reason which compelled Barone and Jordan's flight from Boston. Prior to learning that he too was to be killed, Jordan was told by Barone that they had to leave Boston because Barone did not get permission to kill Limoli. When Jordan pressed Barone on this, Barone immediately retracted the statement, and reiterated that the murder was at Ferrara's direction. Thereafter, Barone never again stated that the murder was anything but a sanctioned hit.

R. 1291-92.

---

[13] Judge Wolf received a courtesy copy of this letter.

This was the first disclosure made by Auerhahn to defense counsel or the court that Barone had ever told Jordan, on any occasion, that Ferrara had not ordered Limoli's murder or that Jordan had made a statement inconsistent with his grand jury testimony.[14]  Auerhahn, therefore, did not disclose the substance of Myrtle Beach version to defense counsel for nearly a year after he learned it, and not until after Ferrara and Patriarca had already pleaded guilty.

Barone went to trial in 1993, and Jordan was brought in as a witness.  In the trial preparations with Auerhahn and Sullivan before Barone's trial, Jordan did not equivocate in his statements that Barone had told him Ferrara had ordered the Limoli murder.

On May 28, 1993, in anticipation of the upcoming trial, AUSA Sullivan, for the government, sent a letter to Barone's defense counsel.  This letter provided details of Jordan's anticipated testimony and, among other things, made the same disclosure as quoted above from the 1992 letter to Patriarca's attorney.

---

[14] When asked why he disclosed the Myrtle Beach statement to Patriarca's counsel, Auerhahn testified that they "were litigating Patriarca's sentencing, so [the disclosure] was relative to that sentencing."  R. 257.

Bar Counsel alleges, in paragraph 132 of her Petition, that
Auerhahn failed to make timely disclosure of the potentially
exculpatory statements to Barone's and Ferrara's trial counsel in
violation of S.J.C. Rule 3:07, Disciplinary Rules 1-102(A)(4),
(5), and (6); Canon Six, Disciplinary Rule 6-101(A)(3); Canon
Seven, Disciplinary Rules 7-102(A)(3), 7-103(B), and 7-106; and
S.J.C. Rule 3:08, PF 7(a).[15]

The applicable disciplinary rule stated that "[a] public
prosecutor or other government lawyer in criminal litigation
shall make timely disclosure to counsel for the defendant . . .
of the existence of evidence, known to the prosecutor or other
government lawyer, that tends to negate the guilt of the
accused, mitigate the degree of the offense, or reduce the
punishment."  SJC Rule 3:07, Canon Seven, D.R. 7-103(B) (1990).[16]
Another rule setting forth Standards Relating to the Prosecution

---

[15] Paragraph 132 of Bar Counsel's Petition also alleges that
Auerhahn violated the disciplinary rules by "failing, other than
in his notes, to memorialize or cause an agent to memorialize
Jordan's statements in Minnesota and/or thereafter that Barone
had told him that Ferrara had not given him permission to kill
Limoli."  It has been proven, however, that Auerhahn did record
this information in his Minnesota notes.   There is no
requirement that Auerhahn have recorded them in any other
manner.   It also appears accepted by all parties that it was
general practice, and not in violation of any rule, that when
prosecutors and agents jointly met with a witness, the agents
did not record what was said.   The Court therefore finds that
the allegations made in the first part of paragraph 132 of Bar
Counsel's Petition have not been proven.

[16] The other disciplinary rules under which Bar Counsel
alleges violations are overly broad or duplicative of this rule.

Function, provided that "[i]t is unprofessional conduct for a
prosecutor to fail to make timely disclosure to the defense of
the existence of evidence, known to him, supporting the
innocence of the defendant. He should, at the earliest feasible
opportunity, disclose evidence which would tend to negate the
guilt of the accused or mitigate the degree of the offense or
reduce the punishment." SJC Rule 3:08, Prosecution Function 7(a)
(1990).

     Unfortunately, in the circumstances of this case, far from
complementing each other, these rules actually conflict. "Timely
disclosure" in D.R. 7-103(B) seems to be measured logically with
reference to the court proceeding such discovery may affect. In
contrast, "disclosure at the earliest feasibly opportunity" in PF
7(a) seems to be measured from the date of discovery of the
information which ought be disclosed.

     Earlier disclosure of the Myrtle Beach statement, we find,
simply would have made no significant difference to Ferrara's
plea discussions. We need not, therefore, here consider whether
the disciplinary rules require pre-plea or pre-sentence
disclosure of data affecting the credibility of government
witnesses (as opposed to data tending to negate the guilt of the
accused). As to Barone, the disclosure of Jordan's
inconsistent statement was made prior to, and in anticipation

of, his trial.  Under the Jencks Act, witness statements need
not be turned over until after the witness has completed direct
testimony.  18 U.S.C. § 3500.  Although under First Circuit law,
inconsistent statements are considered exculpatory and must be
disclosed, the "Myrtle Beach statement" certainly had less
exculpatory force than the "no permission statement", and it was
eventually disclosed to defense counsel before Jordan testified.
We therefore rule that the ultimate disclosure of the "Myrtle
Beach statement" was not untimely under D.R. 7-103(B).

By the same token, although Auerhahn's disclosure may have
been timely under D.R. 7-103(B), it certainly was delayed as
measured against when he learned of the "Myrtle Beach
statement," and thus it was contrary to the admonition in PF
7(a) that disclosure of such matters be made "at the earliest
feasible opportunity."  However, we think that for purposes of
deciding whether sanctionable profession misconduct has
occurred, the command articulated in the disciplinary rule
should have precedence over the arguably precatory language in
the prosecutorial function formulation. We find no violation of
the disciplinary rule. Nonetheless, the absence of a sanction
ought not in any way be taken as condonation of such delayed
disclosure where it was plainly feasible much earlier.

### I.    Disclosure of Trial Outline

During Barone's trial, Jordan testified in a manner largely consistent with his grand jury testimony and his statements that Ferrara had ordered the hit.   Jordan also testified that Ferrara had been involved in several other LCN murders.   The testimony about these other murders had not been disclosed in Jordan's grand jury testimony or in any FBI report or note from Sullivan or Auerhahn which had been turned over to defense counsel.[17]   R. 23.   Buckley was called to the stand and cross-examined about these other murders.   He testified that the murders had been discussed in several meetings, including meetings in 1991 when Sullivan and Auerhahn had been taking notes.   Id.   Defense counsel requested a copy of the prosecutors' notes reflecting their meetings with Jordan in 1988 and 1991.   R. 24.   In response to Judge Wolf's inquiry, Auerhahn represented that he had no notes from the 1988 debriefing sessions with Jordan, but that he did have "extensive notes from the Summer of '91." Auerhahn, however, took the position that those notes were not discoverable.   R. 24.   The court concluded that the notes might be discoverable if they contained exculpatory information but acknowledged that attorney work product would have to be redacted.   Judge Wolf directed Auerhahn to provide him, in camera, those portions of the 1991 notes that covered the

---

17 This testimony was not exculpatory to Barone and thus not subject to the disclosure requirements applicable to exculpatory evidence.

additional homicides about which Jordan had testified.  Id.
Consistent with the court's order, Auerhahn turned over portions
of the Utah notes.

On October 29, 1993, Barone was convicted on the first
three counts against him.  Even after two modified Allen
charges, the jury remained deadlocked on the fourth count
(murder in aid of racketeering) because they could not agree
that it was Barone, as opposed to Jordan, who actually had
pulled the trigger on Limoli.  This count was later dismissed by
the government, and Barone was sentenced to life in prison on
conspiracy to commit murder in aid of racketeering and twenty
years each on the other two counts.  Both Barone and Ferrara
later filed petitions pursuant to 28 U.S.C. §2255 to vacate, set
aside, or correct their sentences.

In May 2002, just before Barone was eligible for parole,
Jordan contacted the Strike Force alleging government corruption
in the Ferrara and Barone cases.  After Jordan testified
regarding the intimidation he felt from the government to say
that Ferrara had ordered the murder of Limoli, Barone and
Ferrara amended their habeas petitions.  A Justice Task Force
investigated Jordan's perjury claims, and on September 3, 2003,
the court began hearing testimony concerning these allegations.
R. 30.

In a conference before the hearing, the court inquired about notes or reports from the government's initial preparation of Jordan. Upon learning that these notes had not been disclosed in the habeas proceedings, he ordered that they be produced. By order dated August 14, 2003, the court required the government to produce to defense counsel "any reports or notes made by any participant in the Salt Lake City meeting regarding any discussion with Jordan at any time."     R. 326.

Although this order did not specify which notes Judge Wolf expected to be produced, Auerhahn turned over only his Utah notes. Auerhahn did not provide the court with his handwritten trial outline of Jordan's expected testimony. On September 5, 2003, during the course of the habeas hearings, Auerhahn testified that he did not find any separate notes from the Minnesota meeting. He stated that he was surprised not to find any notes from that meeting because it was his usual practice to take notes during trial preparation. Auerhahn testified that it was possible that he had the Utah notes with him in Minnesota and that he might have just added to those notes.

Sometime after September 5 and before September 24, Auerhahn produced to government counsel his trial outline containing notes from the Minnesota meeting. These notes had never before been produced to any government or defense counsel.

43

Ans. ¶ 121.  On September 24, as the habeas hearing continued, Auerhahn testified that he found the outline when he went through his files with more care and attention.

Auerhahn argues that initially he forgot that he took notes in Minnesota on his trial outline.  When he turned over his Salt Lake City notes, however, Auerhahn recognized that it was strange he could not find any notes from the Minnesota meeting. The Court is convinced that a more thoughtful consideration and deliberative assessment of his files, immediately after Judge Wolf's order, would have reminded him that he took notes on his trial outline while in Minnesota.  In fact, such careful consideration ultimately did trigger Auerhahn's recollection. This careful attention, however, came late.  Auerhahn's response to this order from the court was lackadaisical at best and Auerhahn's counsel himself conceded Auerhahn was negligent in his response.  Negligence, however, is not enough here.  The relevant rule states that "A lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal."  Mass. R. Prof. C. 3.4(c).  Bar Counsel has failed to prove by clear and convincing evidence that Auerhahn violated any disciplinary rule, and thus the allegations set forth in paragraphs 133 and 134 of her Petition have not been sustained.

As stated before, a ruling that Auerhahn did not violate a

disciplinary rule is not to say that the Court condones his
actions.  Explaining to OPR attorneys why he had not turned over
his outline any earlier, Auerhahn stated that Judge Wolf asked
for his "notes" and he believed that did not include his trial
outline because that outline was not "notes" but rather attorney
work product.  He added, "[I]f you ask to give you my red tie, I
will give you my red tie.  I'm not going to say, do you also
want my blue tie."  R. 227.  Auerhahn has it backwards.  In light
of the gravity of court orders, and the standards to which we
hold attorneys as officers of this Court, particularly in
criminal prosecutions, the duty to clarify the limits of a court
order is borne by the attorney.

    Nevertheless, on the precise question put to us, this Court
concludes that Bar Counsel has failed to demonstrate by clear
and convincing evidence that Auerhahn violated the applicable
rules governing professional conduct of attorneys.

III.   CONCLUSION

    For the foregoing reasons, the petition of Bar Counsel for the imposition of disciplinary sanctions on the respondent is DENIED.


                                        By the Court,

                                        _____
                                        Rya W. Zobel
                                        District Judge

                                        _____
                                        William G. Young
                                        District Judge

                                        _____
                                        George A. O'Toole
                                        District Judge